THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN ELLIS, Defendant-Appellant.

Second District    No. 80-617

Opinion filed June 23, 1982.—Rehearing denied July 23, 1982.

Mary Robinson and Josette Skelnik, both of State Appellate Defender's Office, of Elgin, for appellant.

Theodore Floro, State's Attorney, of Woodstock (Phyllis J. Perko and William L. Browers, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE REINHARD delivered the opinion of the court:

Defendant, John Ellis, was charged in an amended information filed on November 14, 1979, with three counts of murder, one count of voluntary manslaughter and one count of involuntary manslaughter. After a jury trial, defendant was found guilty of the offense of murder and was subsequently sentenced to 25 years imprisonment. Defendant now appeals and raises the following issues for our review: (1) whether the murder conviction ought to be reversed since the weight of evidence presented at trial established that defendant was acting in self-defense; (2) whether the trial court's refusal to instruct the jury regarding the defense of dwelling was reversible error; (3) whether the giving of an instruction requiring defendant to exhaust every reasonable means of escape before employing force in defense of self constituted reversible error; and (4) whether the admission into evidence of an oral statement by defendant which was not disclosed to the defense was reversible error. The evidence adduced at trial was as follows.

Joyce L. Current, who lived in the apartment downstairs from the defendant, testified that at approximately 2 a.m. on August 10, 1979, she heard arguing and later two loud noises coming from the upstairs apartment; approximately three to five minutes elapsed from the sound of the first noise to the sound of the second noise; and between the two noises she could hear someone saying "I mean it." Current also stated that defendant had previously introduced the decedent, Joseph Miller, to her and she estimated that Miller was over 6 feet tall and weighed 195 to 200

pounds. Current later testified that between the sound of the two loud noises she heard a "scuffle" or a "moving about."

Raymond Wilson Current II, Joyce's husband, next testified that on August 10, 1979, he was awakened by the sound of his doorbell ringing; defendant was at the door; defendant told Current that a man upstairs had been shot and further said "Help me, maybe we can save his life." Mr. Current told defendant that he would take care of it, shut the door, and called the McHenry County Sheriff.

Gary Mlekush of the Island Lake Police Department testified that after receiving a radio call, he proceeded to the scene of the occurrence. When he arrived, defendant called to the officer, "He's upstairs, I didn't mean to shoot him." Mlekush then proceeded to defendant's apartment where he observed a man lying on the floor with what appeared to be a gunshot wound to the head. Mlekush also observed a snub-nosed revolver lying on the kitchen counter. Defendant told Mlekush that the man had lunged at him, and defendant shot him.

Deputy Sheriff Thomas E. Sanders next testified that after arriving on the scene, defendant approached him and stated, "I shot him, please get help, I didn't mean to hurt him." Defendant later told Sanders that 3 or 4 days earlier Joseph Miller had been hitchhiking along Route 12 and defendant had picked him up. Since Miller had no place to stay, defendant told Miller he could stay with him. Defendant stated that he wanted Miller to leave the apartment on that night but he refused so defendant went into the bathroom and obtained a revolver. An argument ensued, and when Miller still refused to leave, defendant fired a shot into the wall. Miller stated that guns did not scare him, made a lunge at defendant, and defendant shot Miller in the head. Sanders later testified as follows in response to the prosecutor's question "Now, what else did you do that evening, if anything?":

> "Well, while we were waiting for the rescue squad to arrive, another deputy from the Sheriff's Office, Deputy McKeating arrived at that time and I asked Deputy McKeating if he could watch Mr. Ellis and so he stood there and watched Mr. Ellis and then Mr. Ellis looked at Deputy McKeating and he says,
>
> 'I know what you are thinking but it is not that way, I'm not queer—.' "

Counsel for defendant then objected to this testimony and moved for a mistrial which the court denied.

Deputy George Weber was also present at the scene and testified that defendant told him during the ride to the sheriff's office that defendant had asked his friend to move out of his apartment, an argument ensued, defendant went to the bathroom, obtained a gun, and fired a shot into the wall. The victim then lunged at defendant, and while they were wrestling,

the gun went off. Defendant also stated to Weber, "I should have let him beat me up, I have been beaten up before. I should have just let him there. I didn't want to shoot him."

Deputy Sheriff George Hendle next testified to the content of his interview with defendant which occurred later in the morning on August 10 at the McHenry County jail. At that time defendant related that he had picked up Joseph Miller who was hitchhiking along Route 12. Miller had no place to stay so defendant told him he could stay at his apartment. Defendant stated that he was going to use Miller to help him in his construction work. Defendant and Miller had been drinking during the day at various locations prior to the shooting. When they arrived back at defendant's apartment, defendant told Miller to get out, but Miller refused. Defendant then fired a shot into a room divider in order to scare Miller. Miller stated he was not scared of any gun and started charging at defendant. Miller's eyes were rolling back in his head and defendant could see only the whites of Miller's eyes. Defendant then shot Miller. Defendant told Hendle that he didn't mean to hurt Miller. Defendant also related to Hendle that the right side of his face hurt but he did not know whether or not Miller had hit him. Defendant's face was then examined by Dr. Paul who recommended that defendant be taken to the hospital for examination.

Yuksal Konacki, an assistant medical examiner at the Cook County Medical Examiners Office, testified that he had performed an autopsy on the body of Joseph Miller on November 13, 1979. Konacki discovered a scar on the right side of the forehead extending diagonally from the eyebrow toward the right temple. An internal examination of the decedent revealed a hole in the skull and a laceration of the brain extending from the front to the rear. When asked if he was familiar with the term "tatooing," Konacki responded that "when someone is shot within relatively close distance there appears tiny black specklings around the entrance wound and this is due to the residue of powder particles implanted in the skin." He did not observe any evidence of tatooing near the wound on Joseph Miller. On cross-examination, Konacki stated that he was not asked to examine the wound for evidence of tatooing and that previous surgery performed on Miller could have removed any tatooing that existed.

Dr. Louis Pupillo, a physician licensed to practice in neurosurgery, testified that on August 10, 1979, he examined Joseph Miller in the emergency room at Victory Memorial Hospital and observed that Miller had an incision at the right frontal region three to four centimeters above the right eyebrow. A neurological examination revealed that Miller had an injury to the right frontal lobe of the brain. Miller was taken to the operating room where Pupillo cleaned the wound and removed "some

cutaneous material." Pupillo specifically looked for tatooing but did not observe any around Miller's wound. Pupillo performed surgery on Miller on August 10 and again on September 6. Pupillo described the path of the bullet in Miller's brain as follows:

"The bullet entered the right frontal region, approximately three to four centimeters above the eyebrow, right here and the path had transversed to the left side and had crossed over to the left side and went from front to back, in a slightly downward projectory."

David Brundage, a firearms examiner for the Illinois Department of Law Enforcement, performed tests using the gun found at the scene and laboratory ammunition in order to determine at what distance the gun would fail to leave marks or powder residue. Brundage fired the gun into sterile cotton material from distances of three feet and four feet. Regarding the test from a distance of three feet, Brundage testified that there was evidence of a powder residue on the cotton material. The test from a distance of four feet resulted in very few particles adhering to the material. In Brundage's opinion based on the tests, the gun would fail to leave a powder residue at a distance of greater than three to four feet. Brundage also testified that the type of ammunition used would also affect the result. Other factors that could affect the results of this type of test include the age of the ammunition, the type of powder in the bullet, the manufacturer of the bullet, and whether the bullet was hand loaded or factory loaded. When asked whether it was possible that the powder residue on one of the pieces of cotton material may not have caused tatooing on human skin, Brundage responded, "It's possible that it couldn't have and it is possible that it could have." Brundage further testified that it is possible if a gun is fired close enough to human skin that no tatooing will result since the powder would enter the wound and would not be visible to the naked eye.

Detective Chris Pandre of the McHenry County sheriff's police next testified that he saw the defendant at approximately 3 a.m. on August 10, 1979, at the McHenry County Jail. Pandre conducted a gun residue test on filings taken from the hand of the defendant. The test was never sent to the FBI because it had been previously determined that defendant had shot the gun and defendant's hand was contaminated with dry blood.

Defendant then testified that he first met Joseph Miller as Miller was hitchhiking on Route 12 near Lake Zurich. Miller told defendant that he had no place to stay so defendant said he could stay with him and help on a roofing job. Miller resided at defendant's apartment for about five days. Defendant and Miller had been at the beach on August 9, and, at that time, Miller made some "nasty remarks" about some young girls. Defendant did not like this. Defendant then told Miller that he would have to find somewhere else to stay. Subsequently, the two proceeded to a bar and

began to drink. Defendant again told Miller that he wished Miller would find another place to stay. At approximately 12:30 or 1 a.m. they proceeded back to defendant's apartment. Again defendant asked Miller to leave. Defendant testified that he was wearing an artificial leg at the time. Miller appeared to weigh about 200 pounds and was an inch taller than defendant. In response to defendant's request for him to leave, Miller stated, "No one-legged mother-fucker is going to tell me to get out." Miller also said that he could throw defendant out if he wanted to. Miller began throwing up his arms, and his eyeballs were rolling back in his head. Defendant became scared. Defendant then proceeded into the bathroom and obtained a .38-caliber revolver. Defendant came out of the bathroom and stated, "Look here, when are you going to get the hell out of here?" Defendant pointed the gun in a downward position toward the room divider and fired a shot "to let him know it was loaded * * *." Miller approached defendant and stated, "Guns don't scare me." Miller then moved away from defendant towards the door. Miller then "spun around and lunged at [defendant], waving his arms and was going for the gun." The two were "spinning around" in the kitchen and "the gun was up in the air." The next thing that defendant remembered was that he "came off" a wall in the kitchen and noticed Miller lying on the floor with the gun lying on Miller's stomach. Defendant did not hear the gun go off and could not believe Miller was shot. Defendant then reached down, picked up the gun and placed it on the kitchen sink. Defendant immediately went downstairs to the Currents' apartment because he did not have a telephone. Defendant told Mr. Current to call the police. Defendant testified that he never intended to kill Joseph Miller, did not at any time aim the gun directly at Joseph Miller, and did not fire a shot at Joseph Miller. Defendant further testified that he cannot walk backwards or run because of his leg amputation.

The State presented no evidence in rebuttal. The court then read the following stipulation:

"Number One, that a human being named Joseph Miller lived;

Number Two, that said Joseph Miller was shot on August 10, 1979;

Three, that Doctor Louis Pupillo, M.D. performed surgery on said Joseph Miller on August 10, 1979, August 13, 1979, September 6, 1979, September 17, 1979, and October 17, 1979;

Four, that said Joseph Miller died on November 11, 1979;

Five, that Yaksel Konakci, M.D. performed a post morten [sic] examination on the body of said Joseph Miller on November 13, 1979."

■■■ Defendant first contends that the evidence presented at trial established that he was acting in self-defense, and, therefore, the conviction

should be reversed. The justifiable use of force in defense of self is an affirmative defense which must be raised by the pleadings or evidence, and once raised the State has the burden of proving beyond a reasonable doubt that the use of force was not justified. (*People v. Williams* (1974), 57 Ill. 2d 239, 242, 311 N.E.2d 681; *People v. Connelly* (1978), 57 Ill. App. 3d 955, 956-57, 373 N.E.2d 823.) In the present case, defendant asserts that the State failed to prove beyond a reasonable doubt that his use of force was not justified. The issue of self-defense is a question of fact to be decided by the jury, and its decision should not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt as to defendant's guilt. (*People v. Lewis* (1981), 88 Ill. 2d 129, 151, 430 N.E.2d 1346; *People v. Rowe* (1977), 45 Ill. App. 3d 1040, 1045, 360 N.E.2d 436.) While a reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses (*People v. Mills* (1968), 40 Ill. 2d 4, 19, 237 N.E.2d 697), where the testimony of a witness is neither contradicted, either by positive testimony or by circumstances, nor inherently improbable, and the witness has not been impeached, that testimony cannot be disregarded even by a jury. *People ex rel. Brown v. Baker* (1981), 88 Ill. 2d 81, 85, 430 N.E.2d 1126.

The testimony of defendant and that of various police officers who testified to statements made by the defendant establishes that the defendant and the decedent argued and that the decedent lunged at the defendant. Defendant's testimony at trial on this point was consistent with his statements given to police officers after the shooting. Joyce Current corroborated defendant's testimony that a struggle occurred by stating that she heard a "scuffle" or a "moving about." The State's attempt to show that the gun was fired at a distance rather than at close range in order to dispute the defendant's self-defense theory is unconvincing. Although no evidence of "tatooing" was found around the decedent's wound, David Brundage testified that this could result if the gun was fired at such a close range that all the powder residue would enter the wound itself and would not be visible to the naked eye. Brundage's laboratory tests to determine at what range the defendant's gun would not leave tatooing were also inconclusive. Brundage admittedly used newer ammunition than that found in the defendant's gun and testified that the age of the ammunition could have an effect on the test results. Brundage only conducted two tests—one from a distance of three feet and one from a distance of four feet. When asked if it was possible that the powder residue on one of the cotton pieces may not have caused tatooing on human skin, Brundage stated, "It's possible that it couldn't have and it is possible that it could have."

■■ ■ From our careful review of the record we conclude there was

insufficient evidence to prove the requisite intent in order to find the defendant guilty of murder. The defendant's version of the circumstances of the shooting was not improbable, nor was it impeached by the State's evidence. The absence of evidence of "tatooing" around the decedent's wound which might circumstantially infer evidence of an intentional killing from a distance, contrary to defendant's statements, was not conclusive to establish proof of murder beyond a reasonable doubt. The record is devoid of any other evidence to support a murder verdict. However, we are convinced that the evidence establishes that the defendant is guilty of voluntary manslaughter, and when appropriate, we may reduce the degree of the offense for which defendant was convicted from murder to voluntary manslaughter. (*People v. Hudson* (1979), 71 Ill. App. 3d 504, 390 N.E.2d 5; *People v. Goolsby* (1977), 45 Ill. App. 3d 441, 359 N.E.2d 871; *People v. Brown* (1974), 19 Ill. App. 3d 757, 312 N.E.2d 789; *People v. Cooke* (1968), 93 Ill. App. 2d 376, 236 N.E.2d 97.) Voluntary manslaughter is a lesser included offense of the charge of murder. (*People v. Pierce* (1972), 52 Ill. 2d 7, 11, 284 N.E.2d 279; *People v. Lewis* (1977), 51 Ill. App. 3d 109, 117, 366 N.E.2d 446.) It is a legal compromise between murder and exoneration. *People v. Monigan* (1981), 97 Ill. App. 3d 885, 889, 423 N.E.2d 546.

■■■ Since the evidence presented by both the State and the defendant established that the decedent made a "lunge" at defendant, defendant was entitled to use of some force to repel the attack. One is entitled to the use of force against another when and to the extent he reasonably believes that such conduct is necessary to defend himself against the other's imminent use of unlawful force. (Ill. Rev. Stat. 1979, ch. 38, par. 7—1.) However, force which is likely to cause death or great bodily harm is justified only upon a reasonable belief that it is necessary to prevent imminent death or great bodily harm. (Ill. Rev. Stat. 1979, ch. 38, par. 7—1; *People v. Perry* (1980), 91 Ill. App. 3d 988, 993, 415 N.E.2d 523.) The difference between a justified killing under self-defense and one not justified, amounting to voluntary manslaughter, is that in the former instance the belief that the use of force is necessary is reasonable under the circumstances, and in the latter, the belief is unreasonable. (*People v. Joyner* (1972), 50 Ill. 2d 302, 306-07, 278 N.E.2d 756; *People v. Pickett* (1976), 35 Ill. App. 3d 909, 913, 342 N.E.2d 766.) After review of this record, we have concluded that defendant's belief that he was in danger of losing his life or suffering great bodily harm was unreasonable.

■■ There is no indication in this record that defendant had any particular reason to believe the decedent possessed a weapon which could cause defendant great bodily harm or death, or to warrant the reasonable belief that decedent would kill him or cause him great bodily harm. The difference in physical size and the defendant's disability do not warrant

the use of such deadly force under the circumstances here. Defendant had allowed him to reside in his apartment for a period of five days prior to the shooting and had planned to use him to help on a roofing job. Although the decedent refused defendant's request for him to leave the apartment and indicated his intent to so remain, there is no indication that the decedent in any way threatened the life of the defendant or threatened great bodily harm. The lunge made by the decedent toward the defendant who was holding a gun under the circumstances did not justify defendant's use of deadly force. "A belief that the decedent, unarmed, might kill or greatly injure the defendant, while [he] had a loaded gun, was unreasonable." (*People v. Davis* (1975), 33 Ill. App. 3d 105, 110, 337 N.E.2d 256.) In fact, the defendant himself initiated the use of deadly force when he obtained the gun and subsequently fired a warning shot without any indication of violence on the part of the decedent. Accordingly, under the facts before us we find that the defendant could only properly be convicted of voluntary manslaughter. Section 9—2(b) of the Criminal Code of 1961 provides:

> "A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." (Ill. Rev. Stat. 1979, ch. 38, par. 9—2(b).)

Although the defendant was charged with voluntary manslaughter, and those verdict forms were returned unsigned by the jury upon the jury's verdict finding defendant guilty of murder, we find that on the record before us, the jury could reach but one proper conclusion. Thus, we exercise the power given this court under Supreme Court Rule 615(b)(3) (73 Ill. 2d R. 615(b)(3)) and reduce the degree of the offense for which defendant was convicted from murder to voluntary manslaughter. See *People v. Hudson* (1979), 71 Ill. App. 3d 504, 511, 390 N.E.2d 5; *People v. Falkner* (1978), 61 Ill. App. 3d 84, 92, 377 N.E.2d 824.

■■■ Defendant next contends that the trial court erred in refusing to give Illinois Pattern Jury Instructions, Criminal, No. 24—25.07 (2d ed. 1981) (hereinafter cited as IPI Criminal) relating to the defense of dwelling. (See Ill. Rev. Stat. 1979, ch. 38, par. 7—2.) Defendant's Instruction No. 4, taken from IPI Criminal No. 24—25.07, read:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to terminate unlawful attack upon a dwelling.
>
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if
>
> (1) the entry is made or attempted in a violent, riotous or

tumultuous manner and he reasonably believes that such force is necessary to prevent an assault upon himself or another then in the dwelling; or

(2) he reasonably believes that such force is necessary to prevent the commission of a felony in the dwelling."

To raise the issue of defense of dwelling, the defendant must present some evidence thereon, unless the State's evidence raises the issue. (*People v. Williams* (1981), 96 Ill. App. 3d 8, 17, 420 N.E.2d 710.) In order to justify the use of force in defense of dwelling, the entry into the dwelling must be unlawful or there must be an attack upon a dwelling. (*People v. Chapman* (1977), 49 Ill. App. 3d 553, 556, 364 N.E.2d 577; *People v. Brown* (1974), 19 Ill. App. 3d 757, 763, 312 N.E.2d 789; *People v. Garmon* (1974), 19 Ill. App. 3d 192, 195, 311 N.E.2d 299.) Defendant cites *People v. Stombaugh* (1972), 52 Ill. 2d 130, 284 N.E.2d 640, as authority for the proposition that a defense of dwelling instruction should be given even if the entry was lawful and the rightful occupant has used force to attempt to evict one who has refused to leave. The case does not stand for such a proposition. In *Stombaugh* the supreme court merely held that the defense of dwelling is not restricted to preventing an attempted entry but also extends to terminating an unlawful entry which has been accomplished. (52 Ill. 2d 130, 135, 284 N.E.2d 640.) The victim in *Stombaugh* had broken into the dwelling illegally and, once inside, was shot by the defendant. Thus, the case does not stand for the proposition which defendant advances. Other cases cited by the defendant, *People v. Ulatowski* (1977), 54 Ill. App. 3d 893, 368 N.E.2d 174, and *People v. Spencer* (1971), 131 Ill. App. 2d 551, 268 N.E.2d 192, are inapposite as they are relevant to the separate and distinct offense of criminal trespass to land rather than the issue of justifiable use of force. (See Ill. Rev. Stat. 1979, ch. 38, par. 21—3.) The uncontroverted evidence in the case at bar establishes that the decedent's entry into defendant's apartment on August 10, 1979, was lawful. Defendant testified that the decedent accompanied him back to his apartment on the night in question so that decedent could collect his belongings. Thus, since decedent's entry was lawful, the defense of defense of dwelling was unavailable and the instruction was properly refused.

Defendant further contends that the trial court erroneously gave People's Instruction No. 25 taken from IPI Criminal No. 24—25.09 pertaining to the use of force in defense of self by one who is the initial aggressor. (See Ill. Rev. Stat. 1979, ch. 38, par. 7—4(c).) People's Instruction No. 25 provided:

"A person who initially provokes the use of force against himself, is justified in the use of force only if the force used against him

is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person."

The giving of an instruction requiring the defendant to retreat before using force was held to constitute reversible error and was not corrected by the court's additional giving of another instruction correctly stating the law of self-defense in *People v. Bailey* (1973), 15 Ill. App. 3d 558, 304 N.E.2d 668. This case is, however, inapposite. In *Bailey* the jury instruction was modified to substitute the words, " '[a] person is justified in the use of force only if * * *,' " for the words, " 'The person who initially provokes the use of force against himself * * *.' " (15 Ill. App. 3d 558, 561, 304 N.E.2d 668.) The effect of the modified instruction was to require the defendant to exhaust all reasonable means of escape before she used force. Such was a misstatement of the law.

■■ The instruction in the instant case had no such effect. The instruction correctly stated the law that an initial aggressor must retreat before he regains the privilege to use force. Thus, only if the jury found defendant to have been the initial aggressor would defendant have been required to retreat. There was at least some evidence presented at trial from which the jury might have concluded that defendant was the aggressor. Defendant obtained the revolver from the bathroom and shot into the wall to frighten the decedent. Joyce Current testified that she could hear someone saying, "I mean it." The jury might have concluded under these circumstances that the defendant's actions provoked the decedent's use of force. When there is a question as to whether the defendant or the victim was the initial aggressor, the giving of such an instruction is proper. (*People v. Crue* (1977), 47 Ill. App. 3d 771, 773, 362 N.E.2d 430; *People v. McBride* (1970), 130 Ill. App. 2d 201, 209-10, 264 N.E.2d 446.) The giving of such an instruction does not erroneously assume that the defendant was the initial aggressor and where, as here, it is given with an additional instruction concerning when a person is justified in the use of force to defend himself, the jury is able to resolve the issues on either hypothesis. (*People v. Day* (1972), 2 Ill. App. 3d 811, 813, 277 N.E.2d 745.) Even though decedent's lawful right to remain within the apartment had been terminated by the defendant, when there is some evidence that defendant initially provoked the use of force against him, submission of this instruction is proper. Thus, we find no error in this regard.

Defendant's final contention on appeal is that the admission into evidence of the testimony of Deputy Sheriff Thomas Stamper that defendant had stated to him," I know what you are thinking but it is not that way, I'm not queer" constituted reversible error.

██ The prosecution failed to disclose this statement of the defendant in violation of Supreme Court Rule 412 which provides in relevant part:

"(a) Except as is otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

\* \* \*

(ii) any written or recorded statements and the substance of any oral statements made by the accused or by a codefendant, and a list of witnesses to the making and acknowledgment of such statements." (73 Ill. 2d R. 412(a)(ii).)

The defense is entitled to be furnished with all statements made by the accused, even if the statements cannot be appropriately classified as admissions or confessions, and failure to make such disclosure will in certain circumstances warrant a new trial while in other circumstances it will be deemed harmless error. *People v. Romo* (1980), 85 Ill. App. 3d 886, 896-97, 407 N.E.2d 661.

Defendant cites *People v. Weaver* (1980), 90 Ill. App. 3d 299, 412 N.E.2d 1353, *appeal allowed* (1981), 83 Ill. 2d 574, in which this court held that the State's failure to disclose to the defense an admission by the defendant to an "affair" constituted reversible error. The present case is, however, clearly distinguishable. In *Weaver*, this court stated that such an admission supplied the jury with defendant's possible motive for the murder. No such motive can be gleaned from the defendant's statement in the present case.

██ ██ The rule requiring the State to disclose statements made by the defendant was adopted to prevent surprise and prejudice to the defendant. (*People v. Stewart* (1980), 84 Ill. App. 3d 855, 860, 406 N.E.2d 53.) Defendant asserts that he suffered prejudice in that the issue of homosexuality was injected into the case. Although the statement was clearly irrelevant, it should be noted that such a statement was not solicited by the question of the prosecutor who merely inquired of Officer Sanders, "Now, what else did you do that evening, if anything?" Defendant's statement denying a homosexual relationship does not relate to the issue of defendant's guilt or innocence and does not implicate the defendant in any manner. Thus we do not find that defendant was prejudiced by the failure to disclose it. The defendant must demonstrate that he was prejudiced by the State's failure to disclose, and the claim of prejudice cannot be founded on mere conjecture. (*People v. Burgin* (1979), 74 Ill. App. 3d 58, 72, 392 N.E.2d 251; *People v. Hambrick* (1979), 68 Ill. App. 3d

447, 451-52, 386 N.E.2d 455.) Although the testimony should have been stricken as irrelevant and the jury should have been instructed to disregard it, we regard its admission as harmless error. See *People v. Romo* (1980), 85 Ill. App. 3d 886, 896-97, 407 N.E.2d 661.

For the reasons stated, we modify the defendant's conviction on the charge of murder and reduce it to a judgment of conviction on the charge of voluntary manslaughter as set forth in section 9—2(b) (Ill. Rev. Stat. 1979, ch. 38, par. 9—2(b)). The sentence imposed is vacated and the cause is remanded for the resentencing of defendant on the offense of voluntary manslaughter.

Affirmed as modified, sentence vacated and remanded.

VAN DEUSEN and HOPF, JJ., concur.