THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STERLING FLOYD, Defendant-Appellant.

Second District    No. 2—92—0939

Opinion filed May 11, 1994.

50

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers,

Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

On July 17, 1991, defendant, Sterling Floyd, shot Tommy Stanton and Jamal Foster with a handgun. Stanton died as a result of his wounds, and Foster suffered serious injuries. Defendant was charged by indictment with two counts of first degree murder (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2) (now codified, as amended, at 720 ILCS 5/9—1(a)(1), (a)(2) (West 1992))) in connection with the death of Stanton, and with attempted first degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 8—4 (now codified, as amended, at 720 ILCS 5/8—4 (West 1992))) and armed violence predicated on aggravated battery (Ill. Rev. Stat. 1991, ch. 38, par. 33A—2 (now 720 ILCS 5/33A—2 (West 1992))) in connection with the shooting of Foster. Following a jury trial in the circuit court of Lake County, defendant was found guilty of second degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 9—2 (now 720 ILCS 5/9—2 (West 1992))) and armed violence and not guilty of attempted first degree murder. Defendant was sentenced to concurrent terms of imprisonment of 10 years for second degree murder and 8 years for armed violence. On appeal, defendant contends that the trial court erred in instructing the jury regarding the use of force by an initial aggressor. Defendant further contends that his conviction of armed violence must be vacated because he was motivated by a mitigated mental state when he shot Foster. For the reasons set forth below, we affirm.

The evidence adduced at trial establishes that on the evening of July 17, 1991, defendant had attended a birthday party for his friend, Nate, at an apartment in the Rolling Green apartment complex in North Chicago. Between 10 p.m. and 10:30 p.m. defendant and another friend, Alex Agee, had left the party and were walking in the courtyard of the complex. A hostile confrontation ensued, during which accusations about defendant's and Agee's gang affiliation were apparently made. Defendant walked away, returning briefly to the party, and then came back to the courtyard, armed with a handgun, and shot Foster and Stanton. Witnesses to the events of July 17 provided varying accounts of what occurred at each stage of the incident. A summary of the testimony of the principal witnesses follows.

Jamal Foster testified that he was not acquainted with defendant on July 17. When Foster saw Alex Agee (known to Foster by the nickname "City Folks") and defendant in the courtyard, Foster summoned Agee to speak with him. Joe Smith said, "Man, he ain't

real folks. He with that hook," meaning that Agee was not a real member of Foster's gang, the Black Gangster Disciples, because Agee was associating with defendant, whom Smith thought to be a member of a rival gang, the Vice Lords. Agee told Foster that defendant was his cousin, and Foster apologized, indicating that he meant no disrespect to defendant. According to Foster, defendant walked away across the courtyard. Shortly thereafter, defendant returned with several other people following him. Foster noticed a bulge resembling a gun in defendant's pants pocket. Foster said "I know you got something in your pocket, man. Leave that alone because I ain't going to let you do nothing to my own." At that point, defendant pulled the gun from his pocket and shot Foster in the face. Foster testified that he was unarmed at the time of the shooting, and he believed that Stanton and Smith were also unarmed.

According to Joe Smith's testimony, when defendant returned to where the group was assembled, after having left the first confrontation, defendant held the handgun pointed horizontally. Smith testified that Foster said to defendant, "[y]ou ain't tough 'cuz you got a gun." Smith started to back up around the side of a building, and he heard several gunshots. Shortly thereafter, Smith and a friend, Eric, encountered defendant near the entrance to the building where defendant's apartment was located. Eric asked defendant why he shot his friend. Defendant pointed the gun at them and pulled the trigger. The gun "clicked," but did not discharge.

James Pitts was attending Nate's birthday party, and he observed defendant, Bryant Jackson, and an individual named Kirby enter the apartment where the party was taking place immediately prior to the shooting. Defendant went straight to a back room, and Bryant Jackson went to speak with his brother, Jermaine Jackson, who was playing music for the party. Defendant, Kirby and Bryant and Jermaine Jackson walked outside. As they did so, Pitts observed the handle of a handgun protruding from defendant's pocket. Pitts followed the group outside and observed defendant approaching Foster, Stanton, and Smith in the courtyard. By this point, defendant had drawn the handgun. Foster said, "You bad 'cuz you got a gun now," and defendant shot him. Foster knelt down on one knee, and Stanton walked over to him. Stanton asked why defendant had shot Foster, and defendant then shot Stanton three times and walked away. Neither Foster nor Stanton appeared to have a weapon.

Jermaine Jackson also observed defendant enter the apartment just before the shooting. At that time, Jackson heard defendant say that "it was time to die." Defendant left the apartment, and Jackson and several other guests at the party followed him to see what was

happening. Once outside, defendant approached Jamal Foster and Joe Smith. Defendant was apparently trying to get to Smith, but Foster stood in his way and said "you can't get to my folks." According to Jackson, when defendant tried to get to Smith, Foster would jump in front of him. Jamal was saying, "you can't be f____in' with my folks." Jamal appeared to raise his hand, and at that point defendant turned, pulled out a handgun, and turned back to face Foster. In an angry tone of voice, Foster said he was not afraid of the gun. Then, according to Jackson, defendant and Foster were "cussing and arguing," and defendant shot Foster.

According to Jackson, Tommy Stanton was located in an automobile when Foster was shot and walked over to Foster after the shot was fired. Stanton squatted down next to Foster and held him and repeatedly said "you shot my mother f____in' cousin" to defendant, who was walking away in the direction of his apartment. Defendant then shot Stanton, who was still crouched over Foster. Defendant shot Stanton again as he was falling, and a third time while Stanton was on the ground. Defendant then walked away.

Bryant Jackson testified that when defendant briefly returned to the party immediately before the shooting, he said nothing. Bryant Jackson also testified that before defendant had pulled the handgun from his pocket, Jamal Foster was threatening defendant, saying "I'll kick your ass and take your gun" several times. Foster was physically blocking defendant's path. Defendant pulled the gun out and held it to his side while he continued trying to get around Foster. Foster raised his hand, and defendant told him to shut up and then shot him.

Defendant testified that he had grown up in Youngstown, Ohio, and had graduated from the Watkins Christian Academy in Youngstown. Defendant was spending the summer of 1991 with his mother at her apartment in the Rolling Green complex. Defendant's mother had moved from Ohio to North Chicago in order to take a nursing job. Defendant testified that he was not familiar with the details of gang rivalries in North Chicago and was also unfamiliar with gang terminology. Defendant was unacquainted with Jamal Foster, Tommy Stanton, and Joe Smith when he encountered them in the courtyard of the apartment complex. According to defendant one of those individuals called Agee over and shook his hand with what defendant thought to be a gang sign. Apparently seeking to identify defendant's gang allegiance, the individual asked defendant, "what is you?" Defendant responded that he did not understand what he was talking about, and the individual accused defendant of belonging to a rival gang. Agee told Foster, Stanton and Smith that defendant was

his cousin and told them to leave him alone, but they responded that Agee was not a "real" member of their gang. Referring to defendant, Jamal Foster said "let's beat this punk's ass." Jamal approached defendant and said, "I'm going to kill this punk."

At that point defendant was scared, and he ran back to Nate's party. Defendant told Nate that people outside were going to kill him. Nate provided defendant with a handgun and told him that if he showed the gun to the people who were threatening him, he would be left alone. Defendant testified that he took the gun only to scare Foster, Stanton, and Smith. Defendant left the apartment with the gun in his pocket. Once outside, he was joined by his friend, Kirby. They walked over to Foster, Stanton and Smith. Foster saw the gun (still in defendant's pocket), but nonetheless threatened to "kick [defendant's] ass." Kirby told Foster to leave defendant alone, but Foster said "No, I'm going to kill this punk." At that point Foster started to reach back with his hand, while simultaneously advancing on defendant. Defendant thought that Foster was reaching for a gun, so defendant pulled the gun out of his pocket, holding it at his side, with the muzzle pointed to the ground. Foster kept advancing and pushed Kirby to the side. Defendant then fired the gun without looking.

After Foster began to fall to the ground, Stanton said, "you shot my mother f___in' cousin. I'm gonna kill you." Stanton was bending over Foster. Defendant believed that Foster had been armed and thought that Stanton was reaching for Foster's weapon in order to shoot defendant. Accordingly, defendant shot Stanton.

Alex Agee's 11-year-old sister, Erica Agee, testified for the defense that on July 17 she had observed that Foster had a gun with a black handle in the waistband of his pants. James Williams testified that he saw Foster reaching for a gun with a black handle that was tucked into the waistband of his pants before defendant shot him. After Foster was shot, Williams observed Stanton reaching for the gun in Foster's waistband. Williams admitted he had told police he did not see the shooting and did not mention that Foster was armed. Williams testified that he lied to the police because he was afraid of retaliation if he became involved in the investigation.

Williams also testified that he was present at Nate's party and observed defendant enter the apartment just before the shooting. Defendant appeared panicky. Defendant did not say "it's time to die" or make any other remarks of that character.

At trial it was established that Jamal Foster had previously been convicted of controlled substances offenses and misdemeanor theft. Foster admitted to a history of involvement in fights. The defense

also elicited testimony that Foster had a reputation for violence. Based on the foregoing evidence, the jury returned verdicts of guilty of second degree murder and armed violence.

Defendant first contends that the trial court erred in giving jury instructions on the use of force by an initial aggressor. The State and defendant agreed that the jury should be instructed on self-defense, and Illinois Pattern Jury Instructions, Criminal, No. 24—25.06 (2d ed. 1981) (hereinafter IPI Criminal 2d) was submitted to the jury. Over defendant's objection, however, the trial court also gave People's instruction number 20 (based on IPI Criminal 2d No. 24—25.09) and People's instruction number 21 (based on IPI Criminal 2d No. 24—25.11). People's instruction number 20 states:

"A person who initially provokes the use of force against himself is justified in the use of force only if

the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person;

or

he in good faith withdraws from physical contact with the other person and indicates clearly to the other person that he desires to withdraw and terminate the use of force, but the other person continues or resumes the use of force."

People's instruction number 21 states:

"A person is not justified in the use of force if he initially provokes the use of force against himself with the intent to use that force as an excuse to inflict bodily harm upon the other person."

Defendant contends that these instructions were contrary to the evidence from which the jury could only have concluded that someone other than defendant was the initial aggressor.

Both the State and the defendant are entitled to have the jury instructed on their theories of the case. (*People v. Barnard* (1991), 208 Ill. App. 3d 342, 349-50.) Even very slight evidence upon a given theory will justify an instruction. (*Barnard*, 208 Ill. App. 3d at 350; *People v. Williams* (1989), 205 Ill. App. 3d 751, 765.) Instructions concerning an aggressor's justifiable use of force may be given if the State presents evidence that the defendant was the aggressor, or even if there is a question whether defendant was the initial aggressor. (*Barnard*, 208 Ill. App. 3d at 350; *People v. Santiago* (1987), 161 Ill. App. 3d 634, 641; accord *People v. Johnson* (1993), 247 Ill. App. 3d 578, 585; *Williams*, 205 Ill. App. 3d at 765; *People v. Ellis*

(1982), 107 Ill. App. 3d 603, 614.) In such cases, the use of the instruction does not erroneously assume that the defendant was the initial aggressor, and where, as in the present case, it is given with an additional instruction concerning justifiable use of force principles, the jury is able to resolve the issues under either hypothesis. *Johnson*, 247 Ill. App. 3d at 585; *Santiago*, 161 Ill. App. 3d at 642; *Ellis*, 107 Ill. App. 3d at 614.

■ While defendant contends that the jury could not have concluded that he was the initial aggressor, our review of the record convinces us that a jury question exists in this regard and the challenged instructions were proper. We note that the accounts of various witnesses differed measurably with regard to a number of significant details. There was conflicting testimony regarding the verbal exchanges among defendant, the victims and others, and whether Jamal Foster was or appeared to be armed. Moreover, the witnesses gave varying accounts about when defendant drew his gun and the manner in which he handled it.

With respect to the defendant's initial encounter with Foster, Stanton and Smith, Foster's testimony indicates that although defendant was accused of belonging to a rival gang, no threats were made. Foster also testified that he apologized to defendant when Alex Agee indicated that defendant was his cousin. Defendant, of course, gave a much different account of the initial encounter, claiming that Foster flashed gang signs and unequivocally threatened to beat defendant up and to kill him. The conflicting testimony presented a question for the jury to resolve. Defendant challenges Foster's credibility, noting that Foster was impeached with evidence of convictions of theft and controlled substance offenses, and further noting evidence that Foster had a reputation for violence. These were matters for the jury to consider in assessing Foster's credibility, but did not require the jury to discredit his testimony.

Moreover, any threats made during the initial encounter did not immediately precipitate the shootings. Rather, defendant left the scene of the confrontation and returned armed with a handgun. The circumstances of the initial encounter were relevant to the determination of who was the aggressor at the time of the shootings. (See *People v. Wilson* (1972), 3 Ill. App. 3d 481, 485-86.) However, even if Foster and Stanton were the aggressors in the initial encounter, this would not of itself prove that they were the aggressors just prior to the shootings. (See *Wilson*, 3 Ill. App. 3d at 486; accord *People v. Smith* (1990), 195 Ill. App. 3d 878, 881-82.) Based on the evidence, the jury could have concluded that the initial encounter ended when defendant walked away from Foster, Stanton and Smith, who did not

follow defendant or otherwise attempt to sustain the confrontation. The jury might have further concluded that defendant provoked a second, much more dangerous, confrontation when he returned several minutes later visibly armed with a handgun. See *Smith*, 195 Ill. App. 3d at 882; *People v. De Oca* (1992), 238 Ill. App. 3d 362, 367-68.

It is significant that defendant did not arm himself merely for protection. Rather, according to his own testimony, defendant obtained the weapon in order to scare Foster, Stanton, and Smith. While some witnesses testified that defendant had the gun in his pocket when he approached Foster, Stanton, and Smith, there was testimony that defendant approached with gun in hand, and possibly pointed. The evidence that defendant brandished a handgun could qualify defendant as the initial aggressor. (See *People v. Denson* (1985), 139 Ill. App. 3d 914, 925 (although defendant claimed that he was struck in the lip with some object thrown at him prompting him to fire fatal gunshots, because defendant approached victims and had drawn his gun, the jury could have concluded that his actions provoked the use of force by someone in the group); *People v. Barnard* (1991), 208 Ill. App. 3d 342, 350 (defendant's act of pointing a loaded gun at victim who had refused to leave defendant's house was sufficient to at least allow the question of who was the initial aggressor to go to the jury).) Defendant also notes evidence that Jamal Foster made angry or taunting remarks when he saw that defendant was armed. Clearly, the jury could conclude that defendant's actions provoked that response.

The jury was instructed in accordance with defendant's theory of self-defense. To the extent that the jury could have concluded that either of the victims threatened to use force against defendant (or that defendant reasonably perceived such a threat), it was appropriate for the jury to consider whether defendant's actions provoked the victims' conduct. Therefore, the trial court properly instructed the jury in accordance with IPI Criminal 2d No. 24—25.09.

■ The evidence also supported the use of IPI Criminal 2d No. 24—25.11 regarding the provocation of the use of force as an excuse for retaliation. There was testimony that after the initial confrontation, as defendant was arming himself, he said "it [is] time to die." In addition, Joe Smith testified that after shooting Foster and Stanton, defendant pointed the gun at Smith's friend Eric and pulled the trigger, although the weapon did not fire. Based on this evidence the jury was entitled to consider the possibility that, in approaching Foster and Stanton with a handgun, defendant intended to use any resistance as an excuse for the use of deadly force.

Accordingly, we find defendant's challenge to People's instructions numbers 20 and 21 to be without merit.

Defendant next argues that because the jury returned a verdict of guilty of second degree murder, concluding that defendant acted under an unreasonable belief in the need for self-defense, his conviction of armed violence based on the contemporaneous nonfatal shooting of Jamal Foster must be vacated under the principles of *People v. Alejos* (1983), 97 Ill. 2d 502, and *People v. Drakeford* (1990), 139 Ill. 2d 206.

■ Before proceeding to the merits of defendant's argument, we must address the State's contention that defendant has waived this issue by failing to raise it in a post-sentencing motion. The State relies on our decision in *People v. Lewis* (1992), 235 Ill. App. 3d 1003. In *Lewis* we held that a defendant must file a motion to reduce his sentence in the trial court within 30 days after sentence is imposed in order to appeal only the sentence. (235 Ill. App. 3d at 1005.) We note that after the briefs were submitted in the case at bar, our supreme court reversed our decision in *Lewis*. (*People v. Lewis* (1994), 158 Ill. 2d 386.) However, even if the supreme court had affirmed, the State's reliance on *Lewis* would be misplaced, since defendant is not challenging his sentence, but is instead challenging the validity of the underlying conviction. In order to preserve that issue, defendant was only required to raise it in his post-trial motion. (See *People v. Enoch* (1988), 122 Ill. 2d 176.) Defendant did so, and the issue is properly before us.

Although the question of whether defendant's conviction of armed violence may stand was properly preserved for review, as explained below, we find defendant's argument to be without merit. Section 33A—2 of the Criminal Code of 1961 provides that "[a] person commits armed violence when, while armed with a dangerous weapon, he commits any felony defined by Illinois Law." (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2 (now 720 ILCS 5/33A—2 (West 1992)).) In the case at bar, defendant's armed violence conviction was predicated on the underlying felony of aggravated battery.

In *People v. Alejos* (1983), 97 Ill. 2d 502, our supreme court concluded that voluntary manslaughter (which has since been replaced with the offense of second degree murder) could not serve as the predicate felony for an armed violence conviction. The court reasoned that the purpose of the armed violence statute is to "discourage those who contemplate a felonious act beforehand from carrying a weapon when they set forth to perform the act." (*Alejos*, 97 Ill. 2d at 509.) The court concluded it would not advance this objective of deterrence to enhance the underlying felony of voluntary manslaughter to armed violence since voluntary manslaughter "is committed on the spur of the moment and, by definition, without any deliberation." (97 Ill. 2d at 509.) The court noted:

"[N]o one who commits voluntary manslaughter intends in advance to take a life or employ deadly force; the only 'intent' of this sort that enters into the crime is the decision, arrived at without deliberation and in most cases instantaneously, to use force capable of killing. Before that decision is arrived at, the person who is guilty of voluntary manslaughter typically has no criminal intent whatever. Many such people *** arm themselves long before the onset of the passion or misconception which transforms their intentions from peaceful to homicidal; those that arm themselves later do so after the passion or misconception takes hold of them, after which deterrence is no longer possible." 97 Ill. 2d at 509.

In *People v. Drakeford* (1990), 139 Ill. 2d 206, our supreme court held that a defendant may not be sentenced for armed violence predicated on aggravated battery when a simultaneous conviction of second degree murder is returned *for the same act.* (139 Ill. 2d at 209.) In that case, the court observed that the State was apparently trying to circumvent *Alejos* by charging the defendant with both first degree murder and armed violence (predicated upon aggravated battery) arising out of the same fatal stabbing. There appears to have been no dispute that the incident would not sustain multiple convictions, and when the jury returned verdicts of guilty of second degree murder and armed violence, the trial court sentenced the defendant for the more serious offense of armed violence. Our supreme court held that, instead, the armed violence conviction must be vacated and remanded the cause for sentencing on the conviction of second degree murder. Although *Alejos* proscribed an armed violence conviction by its term predicated on voluntary manslaughter, the court concluded that the rationale of *Alejos* required that the State not be permitted to "utilize the armed violence statute to enhance a defendant's penalty *if a defendant's act constitutes second degree murder.*" (Emphasis added.) 139 Ill. 2d at 213.

As defendant appears to recognize, the holding in *Drakeford* is not directly applicable here. In the case at bar, defendant's simultaneous convictions of second degree murder and armed violence predicated on aggravated battery were *not* based on the same act; the two convictions were for separate acts against different victims. The principle that the State may not punish as armed violence an act constituting second degree murder clearly does not apply here since the armed violence charge was not based upon the fatal shooting of Tommy Stanton, but rather upon the nonfatal shooting of Jamal Foster. Even so, noting that the shootings of Stanton and Foster were closely related, defendant argues that having determined that defen-

dant acted in the unreasonable belief in the need to use force for self-defense when he shot Stanton, the jury must have believed that defendant was operating under the same belief when he shot Foster only moments earlier. Thus, according to defendant, his conduct was undeterrable, making the rationale of *Alejos* and *Drakeford* applicable.

Even if we could conclude that the second degree murder verdict somehow constitutes an implicit finding regarding defendant's mental state when he shot Foster (a matter about which we express no opinion), this would not affect the validity of the armed violence conviction. The basic premise of defendant's argument—that the mitigating factors which reduce first degree murder to second degree murder in a homicide prosecution may be interposed as a defense to a charge of armed violence predicated on aggravated battery consisting of a nonfatal act—has been expressly rejected by our supreme court. *People v. Allen* (1992), 153 Ill. 2d 145; see also *People v. Renehan* (1992), 226 Ill. App. 3d 453, 463.

In *Allen*, the defendant contended that his nonfatal attack was the result of a mitigated mental state which would have reduced the degree of the offense from first degree murder to second degree murder had the victim died. Observing that the only mental states recognized by the aggravated battery provisions are the mental states of intent and knowledge, the court noted that "[a]ggravated battery, unlike either voluntary manslaughter or second degree murder, has no mitigating factors. *** Whether the defendant's conduct is in fact the result of a mental state that, while intentional or knowing, is motivated by a sudden or intense passion or an actual but unreasonable belief in the need for self-defense is irrelevant for purposes of determining whether an aggravated battery has occurred." (153 Ill. 2d at 152.) The court declined to establish a rule requiring the trier of fact, at the request of the defendant, to determine whether or not a mitigated mental state exists in a prosecution for armed violence predicated on aggravated battery; the court indicated that the creation of such a rule was a legislative function. (153 Ill. 2d at 153.) The court elaborated that it was a matter for the legislature to designate mitigating factors applicable to charges of aggravated battery, as it saw fit. Similarly, the court stated that "[t]he legislature may also choose, if it so decides, to amend the armed violence statute to clarify that armed violence may not be predicated on an offense which is motivated by a mitigated mental state even if the predicate offense allows for no consideration of whether or not a mitigated mental state exists." 153 Ill. 2d at 153.

Defendant acknowledges the holding in *Allen*, but attempts to

distinguish *Allen* from the case at bar. Defendant notes that in the case at bar the jury was required to consider evidence of defendant's mitigated mental state in connection with the homicide charges arising from the death of Tommy Stanton. Defendant contends that he is not asking the court "to invade upon the legislative function, but rather to give effect to the wishes of the jury" which, according to defendant, found that defendant's conduct was undeterrable. Although they arose from the same transaction, the shootings of Tommy Stanton and Jamal Foster were separate offenses. We can think of no reason why the substantive principles of law applicable to the charges stemming from the shooting of Jamal Foster should be affected by the circumstance that those charges were tried together with the charges stemming from the fatal shooting of Tommy Stanton. We conclude that *Allen* applies here, and accordingly defendant's armed violence conviction does not violate the principles of *Alejos* and *Drakeford*.

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

WOODWARD and PECCARELLI, JJ., concur.