People of the State of Illinois, Appellee, v. Ronald Cooke, Appellant.

Gen. No. 66–120.

Fifth District.

April 10, 1968.

Robert F. Godfrey, of East St. Louis, for appellant.

John M. Karns, Jr., State's Attorney of St. Clair County, of Belleville, for appellee.

MORAN, J.

On the night of March 18, 1966, the defendant shot and killed Floyd Hobell, the brother-in-law, and seriously wounded Robert Hook, the brother, of one Barbara Burns, a married woman with whom defendant had been keeping company. He was convicted of the murder of Hobell and acquitted of the attempted murder of Hook in a jury trial in the Circuit Court of St. Clair County. After overruling his post-trial motion, the trial court sentenced the defendant to a minimum of fourteen years and a maximum of twenty years in the penitentiary. Defendant appeals.

The defendant contends that "the jury verdict is palpably contrary to the evidence and so unreasonable and unsatisfactory that there is justification for entertaining reasonable doubt as to defendant's guilt."

The defendant, Ronald Cooke, twenty-six years of age, a bread salesman who serviced the supermarket where Barbara Burns was employed as a checker, commenced going with her about December of 1965, and they eventually became so infatuated with each other that on March 16, 1966, they met and decided to divorce their respective spouses and marry each other. They met again on the 17th of March and when the defendant asked Barbara if she had changed her mind, she replied that she had not and was going to talk to her husband, "Jim," when he returned from Carbondale where he had gone with

her father to work on her father's home. About ten o'clock on the morning of the 18th, defendant and Barbara Burns went to talk to Barbara's mother about their plans. Barbara's mother remonstrated with them and told them that they could never be happy doing such a thing. Barbara went to work about 12:00, noon, driving her 1964 Comet automobile. About one o'clock that afternoon, her sister, Mrs. Floyd Hobell, came to the store to see Barbara; and Mrs. Hobell, Barbara, and the defendant talked about the situation in the parking lot of the store. Around nine o'clock that evening Robert Hook, the brother, and Floyd Hobell, the brother-in-law of Barbara, met, according to Hook, for the purpose of talking to Barbara concerning her relations with the defendant. Instead of going to the store where she worked and talking to her, Hook said they decided to follow her from the store in their car and talk to her when she got home. About 9:15 that evening Barbara left the store and drove down Highway 50 to Route 159, made a right turn into 159 and headed south. Somewhere on Route 159 the defendant, Cooke, signaled her by flashing his lights behind her and followed her to a street called Bettina Drive, about three blocks from Barbara's home. Barbara stopped her car and the defendant got out of his car and sat in the passenger's side of Barbara's car. After they were parked a few minutes, Hook drove up, stopped next to Barbara's car and went around her car to the passenger side where the defendant was seated. It is undisputed that almost immediately thereafter the defendant shot and wounded Hook and shot and killed Hobell. It is undisputed that defendant knew Barbara's husband by sight and that he knew Barbara's husband was out of town on the night in question; that the defendant had never seen Hook or Hobell before and did not know they were related to Barbara until she told him immediately after the shooting. It was dark at the time and place in question.

378

Barbara Burns testified on behalf of the State that she and the defendant were parked in her car when another car stopped alongside her car and two men got out. The defendant got out of her car about the same time. The next thing she remembered was hearing some shots which sounded like firecrackers and seeing some sparks out of her rear window. She then got out of her car and saw her brother getting up from where Hobell was lying. Her brother was bleeding badly and he asked her to call an ambulance. He asked the defendant if he was sick and the defendant, who had a gun in his hand, said that he was not, that he was just frightened. At another point in her testimony she stated that the first time she saw Hobell after the shots were fired, he was lying by the right front wheel of the defendant's car; and at another point she stated she might have testified at another hearing that Hobell was leaning against the right front fender of the defendant's car when she first saw him after the first shots were fired. She then asked a Mr. Davis, who came out of a house across the street, to call an ambulance. Defendant then laid the gun on the hood of his car and she threw the gun inside. After defendant calmed down, he went over and asked her brother if he was all right. He said, "Are you all right, Jim?"

John Davis, Jr., who lived across the street from where the incident occurred, testified on behalf of the State that he heard two shots that sounded like firecrackers, and when he went outside to see what had happened, Barbara Burns asked him to call an ambulance. He went back into the house, called an ambulance and then returned to the scene. He saw three cars facing west—a blue one on the front left and a red one on the front right. There was another red car parked about six feet behind the front red car. The headlights on the blue car were burning and the motor was running. He turned the motor of the blue car off and put the lights

on park at the request of the defendant. Hobell was lying on his right side by the passenger side of defendant's car with his face about six inches from the right front tire. He was lying with his head pointed west and his feet to the east, which would mean that he was lying parallel to defendant's car with his head pointing to the front and his feet to the rear of defendant's car.

Robert Hook testified that he was thirty-one years of age, six feet three inches in height and weighed 270 pounds on the night he was shot. He met his brother-in-law, Floyd Hobell, about ten minutes to nine p. m., on the 18th of March, 1966, for the purpose of talking to his sister concerning her relationship with the defendant. They followed his sister from the store and pulled alongside the place where his sister was parked in her car with the defendant. He left the lights of his car burning and the engine running. Hobell got out of the passenger side and Hook got out of the car on the driver's side and went around to the passenger's side of his sister's car. By the time Hook got there, the defendant was already outside the car. The defendant said, "Let's talk this over, Jim" and then shot him. Hook said he was unarmed and at no time threatened defendant in any way. He was shot once under his arm and once in the stomach. He said he thought he was shot three times, but was told he was shot only twice. He had powder burns on his stomach. When he was shot, he was standing at the doorway on the passenger side of his sister's car and the next thing he remembered was leaning back over her car. He then saw Hobell coming toward him with the defendant going toward Hobell. Hobell asked the defendant if he was crazy, and "Cooke just shot him. He didn't say anything." The first time Hobell was shot he fell backwards over the hood of the defendant's car and then begged Cooke not to shoot him again. He said, "Please don't do it again," and Cooke "reached over" and shot him again, the second time. Hobell had

no gun, knife, or any weapon of any kind in his hand at the time. Hobell was not advancing on defendant, but defendant was advancing on Hobell. Hobell then dropped to the ground next to the right front tire of Cooke's car, on the passenger side. Although Hook was shot, he tried to help his brother-in-law. Cooke then stood over Hook and Hook said, "Man, are you crazy? You just killed this man." And Cooke said, "I might as well put you out of your misery, too." "When he said this, I was holding Floyd and I was looking at him." "He walked over, pointed the gun at me and called me Jim, again." Barbara told him that was her brother-in-law. "Cooke grabbed me and said, 'My God,' he says, 'I'm sorry,' and then I begged him to call an ambulance."

Defendant testified that he was parked with Barbara Burns in her car and seated in the passenger side on the night in question, when a car suddenly pulled up and parked alongside of them and two men got out. He grabbed the handle of the door and whether he or Hook opened the door, he did not remember. As soon as the car door swung open, Hook grabbed him by the right arm and pulled him out of the car and pinned him against the side of the car with his body. Defendant was six feet, two and one-half inches tall and weighed approximately 185 pounds. Hook was taller and heavier, being six feet, three inches, and weighing between 260 and 300 pounds. Defendant's gun was in a shoulder holster. Hook, up to that time, had said nothing to defendant and defendant did not know whether Hook planned to beat him up or rape his companion. "I jammed my hand between my body and his and grabbed the gun and I stuck it in his stomach and fired the first shot. I fired it at an angle at his stomach, on the side." This shot did not affect Hook at all, "so I figured I missed him as he was too much for a 38 to put down, so I raised the gun and fired higher on the same side at an angle." When he fired the second time, the bottom part

of Hook's body still had him pinned against the car. The first shot had "edged him back just a hairline," but their bodies were still in contact when he fired the second time. After the second shot, Hook backed off about a foot and defendant took two steps down the side of the car with his back to the car, still watching Hook, when out of the corner of his eye he caught a glimpse of a figure coming up on his right. He turned and saw Hobell running down the side of defendant's car from the rear to the front, about six feet away. He could not see whether Hobell had anything in his hand, and rather than wait for something to happen, he fired a shot which had no effect on Hobell at all. Hobell was six feet away when he fired the first shot and he did not know whether he had hit him or not. Hobell continued to run toward him and he fired the second time. When the second shot was fired, Hobell stopped abruptly, knelt down and stood up again. He then leaned against the right front fender of defendant's car. (There was blood on the right front fender of the defendant's car where Hobell had leaned against it.) Hobell said nothing and when the defendant asked Hook why he had pulled him out of the car, Hook said, "Why did you shoot me? You must be crazy."

After the shots were fired, Barbara got out of the car and said, "My God, that is my brother-in-law." There were four shells in the revolver, which held only five shells. He always kept the gun revolving on an empty chamber. He denied standing next to Hook and telling him he might as well put him out of his misery. He assisted the ambulance driver in putting Hook in the ambulance. He denied identifying Hook as Jim. He said he had a bruise on his arm where he was grabbed.

In the opinion of a majority of the members of this court, the evidence discloses that the defendant at the time of the killing was acting under a sudden and

intense passion resulting from serious provocation by Hook and Hobell at the time of the killing and therefore was guilty of manslaughter, but not murder.[1] The relevant portions of the Criminal Code are:

"9–1. Murder. (a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

"(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

"(2) He knows that such acts create a strong probability of death or great bodily harm in that individual or another;

. . . . . .

"9–2. Voluntary Manslaughter. (a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

"(1) The individual killed, or

"(2) Another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

"Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

"(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify

_____

[1] One of the members of this court concurs in the finding that the defendant was not guilty of murder but was guilty of manslaughter, but believes our finding should be based on chapter 38, section 9–2(b) of the Criminal Code, rather than on section 9–2(a).

or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable."

In his Committee Comments on this section, Mr. Charles H. Bowman states:

"The offense of voluntary manslaughter appears to be essentially a legal compromise between murder and exoneration, recognizing but not excusing a human weakness consisting of an intense (or irresistible) passion caused by serious provocation, resulting in homicide."

In People v. Bartley, 263 Ill 69, 104 NE 1057, at page 75, the Supreme Court said:

". . . Besides, the law makes a distinction and allowance between what a reasonable person would do in the heat of passion or under great provocation and what the same person would do in cooler moments, and it is just this distinction that makes a homicide in one case murder and in another case manslaughter. It is true that the jury, from the evidence, have the right to say which crime has been committed, but when the evidence utterly fails to establish the crime of murder as charged and shows only manslaughter at most, then the verdict of murder should be set aside."

In acquitting the defendant of the crime of the attempted murder of Hook the jury had to be convinced that the defendant reasonably believed that he and/or his companion were in danger of imminent death or great bodily harm at the time of the altercation between Hook and the defendant. Chapter 38, section 7-1, Ill Rev Stats. Almost immediately after the shooting of Hook and while defendant was still under intense passion from the altercation between himself and Hook, he shot Hobell. The

only possible act of deliberation on his part was the testimony of Hook that Hobell begged defendant not to shoot him the second time. However, this and other aspects of Hook's testimony are not very convincing. We believe that there was not enough time for the voice of reason to return to "cool the blood" of defendant, and that the intense passion aroused in defendant by the altercation between Hook and defendant had not yet subsided. Therefore, the finding of murder must be reversed. People v. Walker, 55 Ill App2d 292, 204 NE2d 594; People v. Bissett, 246 Ill 516, 92 NE 949; People v. Bartley, supra.

■ Although we are convinced that the evidence in this case did not justify a conviction of murder, we are convinced that the defendant was guilty of manslaughter. People v. Walker, supra, People v. Bissett, supra, People v. Bartley, supra. However, neither the defense counsel nor the State offered an instruction on manslaughter.

In People v. Walker, supra, the Appellate Court found that the evidence did not warrant a murder conviction but did warrant a manslaughter conviction. Although the defense counsel did not request the trial court to reduce the charge to manslaughter, and although the record did not disclose whether the trial court considered a change of the charge, nevertheless the Appellate Court, pursuant to the authority given courts of review by chapter 38, section 121–9 of the Illinois Revised Statutes, 1963, found the defendant was guilty of voluntary manslaughter and remanded the case to the Circuit Court for sentencing for that crime. The exact language of section 121–9 is now contained in Rule 615 of the Illinois Supreme Court and provides in part:

> ". . . Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.

". . . On appeal the reviewing court may: . . . (3) reduce the degree of the offense of which the appellant was convicted; . . ."

Therefore, under the foregoing rule, a reviewing court may reduce the degree of the offense and apply it in a pending case such as this.

We find that under the evidence, defendant was guilty of voluntary manslaughter and remand the cause to the Circuit Court of St. Clair County with directions to enter a finding of guilty of voluntary manslaughter and to impose a sentence for that crime appropriate to the facts and circumstances of this cause and to whatever other matters in aggravation or mitigation may be made available to the trial court.

Reversed and remanded with directions.

GOLDENHERSH and EBERSPACHER, JJ., concur.