THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FRANK E. VAUGHN, Defendant-Appellant.

(No. 74-24;

Fifth District—March 12, 1975.

Robert F. Godfrey, of East St. Louis, for appellant.

Robert H. Rice, State's Attorney, of Belleville (Robert L. Craig, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

On January 31, 1972, the appellant, Frank Vaughn, was charged in a two-count indictment with the murder of Reynolds Campbell (Count I) and with the attempted murder of Matthew Drake (Count II). On September 20, 1973, a jury found the appellant guilty of murder in Count I and not guilty of attempted murder on Count II. From the judgment of conviction of murder, where the appellant was sentenced to a term of from 14 years to 30 years, the appellant brought his appeal.

The appellant raises two issues for review: First, whether the State proved beyond a reasonable doubt that appellant killed the decedent, Campbell, without lawful justification since there was evidence indicating that appellant had acted in self-defense; and second, whether appel-

lant was not guilty of murder because the evidence, at best, established only the commission of voluntary manslaughter. To determine these issues, we must scrutinize the substantial and often conflicting evidence adduced at the trial.

It will be instructive at the outset to note what is not disputed in the evidence of this case. All events occurred on December 4, 1971, at the V.F.W. Hall in East St. Louis, Illinois. Both appellant and the deceased, Reynolds Campbell, as well as most of the witnesses who testified at the trial were members of the same V.F.W. Post. Alcoholic beverages and food were served at the Hall, and the public was allowed on the premises from 9 to 5, and nonmembers were present on December 4. Appellant arrived at the hall in the morning, and remained there until forcibly removed later in the evening. Upon arrival in the morning, appellant had volunteered his services to clean and help in the kitchen. Throughout the time he was at the Hall, appellant had a handgun inside his coat. It is undisputed that in the evening, several members wanted appellant to leave the Hall, and indeed, appellant was forcibly removed from the premises and "pushed" and "pulled" to a parking lot immediately adjacent to the back door. It is undisputed that the deceased, Campbell, appeared at the back door while appellant was being held next to an automobile, and it is undisputed that thereafter, appellant drew his handgun and shot and killed Campbell.

With regard to the disputed evidence, we divide the factual disputes into three categories:

A. The circumstances surrounding appellant's removal from the Hall;

B. The manner in which appellant was removed from the Hall; and

C. The events immediately prior to the killing.

There are substantial conflicts in the evidence with regard to each of these three categories. We choose to concentrate our attention on the testimony of State's witnesses, unless otherwise indicated below.

A. *The circumstances surrounding appellant's removal from the V.F.W. Hall.* State's witness, Henry Harris, who was a bartender at the Hall, testified that he arrived at the Hall at about 9:30 A.M. on December 4, 1971, and thereafter began to clean up the bar. He testified that Reynolds Campbell was the manager of the bar, and that appellant was at the Hall upon Harris' arrival. Harris testified that he sold alcoholic beverages to the appellant, and that on one occasion, he poured whiskey onto a customer's plate. Earlier in the morning, Harris testified that he had heard Campbell telling appellant that he was getting too loud and using "too much foul language."

State's witness John Sampson testified that he did not personally see appellant loud or boisterous. Sampson arrived at the Hall at 4 P.M.

and remained there until the time of the killing at about 10 P.M. State's witness, Johnny Neal, who arrived at the Hall at about 6:50 P.M., testified that he did not see the appellant creating any kind of disturbance anywhere. Further, he testified that he did not think the appellant was drunk. State's witness Matthew L. Drake testified that he did not see appellant consume any kind of alcoholic beverage.

Appellant himself testified that he arrived at the Hall about 7:30 A.M. and helped in washing glasses, cleaning up and talking and drinking with others at the Hall. He states that at about 12 noon, he was in the kitchen fixing sausage and eggs, and as he was cleaning up after the breakfast, some liquor overturned in a tray and he took it back to the kitchen. He stated that he did not intentionally do this and that no trouble resulted. He testified that he went back into the kitchen and Reynolds Campbell returned, saying not to drink anything more. According to the appellant, he remained in the kitchen until later in the evening when he took an order out to someone and Campbell saw him and told him that he did not want him to remain in the club. Defense witness Dwight Quinn testified that he was at the Hall on the evening of December 4, 1971, with a friend, George Elliot, at which time they saw appellant and spoke to him. Quinn stated that appellant did not appear to be drunk, and he stated that he saw appellant shoved into the kitchen while taking an order.

*B. The manner by which appellant was removed from the Hall.* Substantial conflict occurs in the State's testimony with regard to the manner by which appellant was removed from the Hall. Matthew L. Drake testified to the effect that he was leaving the Hall at about 10 P.M. when he saw Reynolds Campbell standing just outside the back door and appellant leaning on an automobile, about 4 to 6 feet away from Campbell. Drake testified that he did not hear any noise or commotion as he was leaving the Hall. In contrast to Drake's testimony, John C. Sampson testified that Matthew Drake, Reynolds Campbell and he "pushed" and "pulled" appellant through a breezeway and out of the back door from the kitchen area of the Hall. He stated that he did not personally observe appellant to be boisterous, but "they" had told him that appellant was being boisterous and using foul language in front of women. In trying to get appellant out through the kitchen door, Sampson stated that he had hold of one of appellant's arms and was pulling on the appellant.

State's witness Michael Brooks stated that he was in the Hall on the evening in question and he saw appellant at the bar talking to some fellows. He testified that he did not see Vaughn making any kind of disturbance but he did see people ask him to leave. He stated that he

saw some people trying to push Vaughn on out of the back door, but not in a violent type of way. State's witness Walter Edwards testified that he arrived at the Hall at about 7 or 8 P.M. in the evening and later saw Sampson begging the appellant, who was standing outside of the kitchen door, to take his (appellant's) foot out of the door. Then he saw Drake grab appellant in the breezeway and a "scuffle" ensued. On cross-examination, Edwards testified that there was "scuffling" in the breezeway and he was able to hear blows being struck.

Appellant testified that Campbell told him that he did not want him in the club, and then Drake and another "big guy" began to push him and held his hands and arms. He stated that he then got a little stubborn, and that's when they started to fight. He stated that Drake and he began swinging punches at each other and he was hit in the stomach to the point he became weak. He stated that "they" were working him over. Michael Brooks testified on direct examination for the State that shortly after the shooting he saw that appellant's face was bruised and bleeding a little. He also stated that some extreme force was being used by these three men. The State produced some evidence to show that after the shooting someone had attacked appellant. Defense witness Quinn stated that he saw appellant being pushed out the back door, and he stated that he and George Elliot saw people beating on appellant.

C. *The events immediately prior to the killing.* State's witness Michael Brooks testified that about 5 minutes after he saw appellant being pushed out of the back door, he saw Reynolds Campbell approaching the kitchen, and he asked Campbell where he was going, and Campbell told him that appellant was outside "still clowning or something to that effect." Brooks further testified that he thought that each of the appellant's arms were being held and that the men were talking to the appellant. On cross-examination, Brooks testified that Campbell walked out the back door (toward appellant) in a type of walk "you would use when you're angry at someone and you're ready to do something to them." He also stated that when Campbell uttered the words about fighting, Sampson and the other man holding appellant turned him loose.

State's witness Drake testified that when he stepped out on the back porch the appellant knocked him down without provocation, and then the appellant took a shot at Campbell. Later, Drake testified that appellant shot Campbell and then knocked him (Drake) down and threatened to shoot him also.

Appellant testified that he was taken out the back door, Sampson and Drake held him against a car, and Campbell came through the door and said "I'll stop this once and for all," and Campbell said to turn him (appellant) loose, whereupon Sampson turned him loose. Appellant then

testified that "* * * that's when I whirled and fired, because I didn't know whether Reynolds [Campbell] was coming out of the kitchen. Because I knowed they wasn't playing and I was scared. And when he come out, comes back again, this big old man holding me up against the car, and when he said turn loose with him and he was getting out of the way, I didn't know what he was getting out of the way for. I didn't know what the man had. And I was scared. And when he loosened me, I was shoving on Drake down, and went to try to defend myself, which is what I think anybody would have did." Appellant also testified that he could not see Campbell as he came out of the back door, and that "all I could hear Campbell say, I'll stop it once and for all. See?" And when he got to the door, he said, "[T]urn him loose, Boots, turn him loose, dirty * * * turn him loose." And Boots stepped back, but Drake held on. When asked what was his intention when he took the gun out of his coat pocket, appellant testified: "To stop being abused, my intention was to try to save my life cause I didn't know what the man had. And my intention was not to be beaten no more and get away from there like I wanted to, but I couldn't run off with them holding me there. This is true."

■■ While we as a reviewing court cannot usurp the province of the fact finder who must judge the credibility of the witnesses and weigh evidence, neither can we read a transcript in a vacuum totally divorced from the realities and experience of life. It would be singularly naive for us to ignore the crucial discrepancies between and among the testimony of State's witnesses Drake, Sampson and Brooks. In particular, Drake's testimony conflicts on the following points with the testimony of other State's witnesses: (1) Drake's testimony in effect states that he was not involved in "pushing" or "pulling" the appellant out of the building; (2) Drake changes his story with regard to whether he was hit first before Campbell was shot, or vice versa; (3) Drake's testimony is at odds with the testimony of others regarding holding appellant against the car in the parking area; (4) Drake's testimony conflicts with the testimony regarding Drake hitting appellant; (5) Drake's testimony is at odds with the testimony of others stating that Drake and Sampson were holding appellant against the car in the parking area. We are also struck by the unarticulated time sequence of events in this case. It would appear to us from the transcript of the trial proceeding that a reasonable cause to remove appellant from the premises occurred in the morning or early afternoon of December 4, 1971, and that there was little, if any, precipitating action on the part of the appellant to cause his removal from the premises at about 10 P.M., about 5 minutes or so prior to the shooting.

■■■ We believe that the evidence discloses that appellant at the time of the killing believed, although such belief was unreasonable, that circumstances were such, that if they existed, would have justified or exonerated the killing under the principles stated in article 7 of our Criminal Code. Accordingly, we find that the appellant was guilty of manslaughter, but not murder.

The relevant portions of the Criminal Code are sections 9—1 and 9—2 (Ill. Rev. Stat., ch. 38, pars. 9—1, 9—2, as amended):

> "§ 9—1. Murder. (a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:
>
> (1) He either intends to kill or to do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
>
> (2) He knows that such acts create a strong probability of death or great bodily harm in that individual or another; * * *"
>
> "§ 9—2. Voluntary Manslaughter. (a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> (1) The individual killed, or
>
> (2) Another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.
>
> Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.
>
> (b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.
>
> (c) Sentence. Voluntary manslaughter is a Class 2 felony."

In the defense of his case, appellant raised the issue of self-defense. The justifiable use of force intended to cause death is articulated in section 7—1 of the Criminal Code as follows:

> "A person is justified in the use of force against another when to the extent that he reasonably believes that such conduct is necessary to defendant himself or another against such other's imminent

use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

Whether the taking of a life is justified under the law of self-defense is a jury question. As set forth in *People vs. Jordan,* 18 Ill.2d 489, 492-93, 165 N.E.2d 296, 298:

"Whether a killing is justified under the law of self-defense is always a question of fact to be determined by the jury under the proper instructions. * * * Once a jury has decided this question and has reached a verdict, this court will not disturb that finding unless the evidence is palpably contrary to the verdict or so unreasonable, improbable, or unsatisfactory that it justifies entertaining a reasonable doubt of the defendant's guilt." (See also *People v. Johnson,* 2 Ill.2d 165, 117 N.E.2d 91.)

In the trial of this case, appellant raised the issue—and the jury was instructed upon—the law of self-defense, and the jury held against the appellant. However, after a review of the entire record in this case, we believe that appellant believed the circumstances to be such, that if they existed, would justify or exonerate his killing under the principle stated in section 7, but that appellant's belief was unreasonable.

Appellant was "pushed" and "pulled" out of a building by three or more men. There was "scuffling" that continued between 5 and 10 minutes while appellant was being removed from the premises. Some of the State's witnesses observed that they either heard blows struck or that excessive force was being applied to the appellant. Appellant was not merely taken out of the building, he was held against the vehicle in the parking area outside of the building by two men. The State's witness Brooks made the observation that Reynolds Campbell, who apparently instigated the removal of the appellant in the evening, insisted upon carrying the fight outside the Hall. While there is conflict over what exactly Campbell said upon reaching the back door, it is clear that words were said to the effect of turning the appellant "loose" for a purpose. As the appellant's brief has indicated, the "atmosphere was heated." We conclude that in such a heated atmosphere, the appellant believed, although unreasonably, that the circumstances were such that would justify or exonerate his killing Campbell under the principles expressed in section 7—1.

■■ In the Committee Comments on section 9—2, Mr. Charles H. Bowman states:

"The offense of voluntary manslaughter appears to be essentially

a legal compromise between murder and exoneration, recognizing but not excusing a human weakness consisting of an intense (or irresistible) passion caused by serious provocation, resulting in homicide." (Ill. Ann. Stat., ch. 38, par. 9—2, committee comments Smith-Hurd 1972.)

In *People v. Bartley*, 263 Ill. 69, 75, 104 N.E. 1057, 1059, the Illinois Supreme Court stated:

"Besides, the law makes a distinction and allowance between what a reasonable person would do in the heat of passion or under great provocation and what the same person would do in cooler moments, and it is just this distinction that makes a homicide in one case murder and in another case manslaughter."

Section 9—2(b) goes even further in making a legal compromise between murder and exoneration. In effect, section 9—2(b) takes into account that human beings, in a heated atmosphere, might reach conclusions which seem to them under the circumstances reasonable, but which in the cold light of rational analysis are obviously unreasonable. It is the genius of our law that, while not condoning unreasonable behavior, it nevertheless recognizes and takes into account that human beings may reach unreasonable beliefs, given the circumstances of the moment and the conditions under which beliefs are formulated and drawn.

■■ We are not unmindful of the fact that neither the State nor the appellant requested an instruction with regard to voluntary manslaughter. As set forth by the Illinois Supreme Court in *People v. Harris*, 8 Ill.2d 431, 434:

"* * * if there is any evidence in the record which, if believed by the jury, would reduce a charge of murder to manslaughter, an instruction defining that crime should be given."

As we stated in *People v. Cooke*, 93 Ill.App.2d 376, the appellate court, pursuant to the authority given to courts of review under Rule 615 of the Illinois Supreme Court, may notice plain errors or defects affecting substantial rights and may reduce the degree of the offense of which the appellant was convicted. As set forth in Supreme Court Rule 615 (Ill. Rev. Stat., ch. 110A, par. 615, as amended):

"(a) * * * Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court. * * * (b) On appeal the reviewing court may: * * * (3) reduce the degree of the offense of which the appellant was convicted."

Accordingly, a reviewing court can reduce the degree of an offense in a pending case such as this. *People v. Cooke*, 93 Ill.App.2d 376.

In view of our holding above, we find that under the evidence the

appellant was guilty of voluntary manslaughter and remand the cause to the Circuit Court of St. Clair County with instructions to enter a finding of guilty of voluntary manslaughter and to impose a sentence for the crime appropriate to the facts and circumstances of this cause and to whatever other matters in aggravation or mitigation may be made available to the trial court.

Reversed and remanded with directions.

G. MORAN and CREBS, JJ., concur.