# Illinois Official Reports

## Appellate Court

---

### *People v. Morrow*, 2013 IL App (1st) 121316

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MITCHELL MORROW, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-12-1316 |
| Filed<br>Rehearing denied | December 31, 2013<br>January 30, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions and sentences for armed robbery and murder were upheld notwithstanding his contention that the trial court erred in denying him leave to file a successive postconviction petition alleging that his trial counsel was ineffective in failing to request a second-degree murder instruction, since the evidence at trial did not support a finding of second-degree murder. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 94-CR-26967 (03); the Hon. Evelyn B. Clay, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Michael J. Pelletier, Alan D. Goldberg, and Caroline E. Bourland, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Jon Walters, and Nancy Colletti, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Taylor concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a jury trial, defendant Mitchell Morrow was convicted of the August 28, 1994, armed robbery and murder of Kazmierz Kosinski. After considering factors in aggravation and mitigation, the trial court sentenced defendant to 60 years in the Illinois Department of Corrections, to be served concurrently with a 20-year sentence for armed robbery. On direct appeal, we reversed defendant's armed robbery conviction, but we affirmed his conviction and sentence for murder. *People v. Morrow*, 303 Ill. App. 3d 671 (1999). Defendant next filed his first postconviction petition in which he raised numerous claims of ineffective assistance of trial counsel and trial court errors. The trial court granted the State's motion to dismiss, and we affirmed the dismissal on appeal. *People v. Morrow*, No. 1-00-3878 (2002) (unpublished order under Supreme Court Rule 23).

¶ 2 Afterwards, defendant requested leave to file his second postconviction petition in which he claimed for the first time that his appellate counsel provided ineffective assistance of counsel when he failed to argue on direct appeal that defendant's trial counsel ineffectively failed to request a second-degree murder jury instruction. The trial court found that, although defendant established cause to file a successive petition, he did not show prejudice to support his claim because the evidence at trial did not support a finding of second-degree murder. As a result, the trial court denied defendant leave to file a successive postconviction petition, and defendant now appeals. On this appeal, defendant argues that the trial court erred since he established both cause and prejudice required to file a second postconviction petition. For the following reasons, we affirm.

## BACKGROUND

### I. Trial

The State's evidence at trial relied primarily on the prior statement and grand jury testimony of Ramona Siler, an alleged eyewitness to the murder. Siler told detectives that she was a prostitute and that defendant was her boyfriend and pimp. In August 1994, Siler was five months pregnant with defendant's child, and she had previously told him that he was the father. On August 28, 1994, Siler was performing sex acts for Kazmierz Kosinski, the victim, in his vehicle with another prostitute, Birandi Paschal, when Paschal reached for Kosinski's wallet. A fight ensued, and Siler called for the help of defendant and Alanda McComb, Paschal's pimp, both of whom were sitting in their vehicle nearby. McComb ran toward Kosinski's vehicle and punched him. McComb then instructed Siler and Paschal to exit Kosinski's vehicle, and as the two women ran away, defendant approached Kosinski, pulled out a gun, and shot him twice as he sat in the driver's seat. Defendant, Siler, Paschal, and McComb then returned to their own vehicle and McComb drove away with Kosinski's wallet. At some point, McComb hid the gun under the hood of his vehicle, and the four equally split $160 in cash recovered from Kosinski's wallet.

Siler repeated essentially the same account of events in both her written statement to the police and in her grand jury testimony. However, she recanted her story at trial, explaining that she lied because she was addicted to heroin and that she wanted to go home as soon as possible so that she would not suffer from withdrawal. Defendant testified in his own defense and claimed that he did not shoot Kosinski and that he was not with Siler, Paschal, or McComb on the night of the shooting. Defendant also claimed that Siler was no longer his prostitute in August 1994; that they were no longer in a relationship; and that he was not the father of Siler's child.

At opening argument, defendant's counsel told the jury, "[Defendant] was not at the scene of this crime, did not ask [Siler] to do anything to Kazmierz Kosinski, did not derive any benefit from this crime, and is absolutely innocent of these charges."

### A. Autopsy, Ballistics, and Other Evidence

Forensic investigator Carl Brasic testified that, on August 28, 1994, he processed the crime scene. There, Brasic observed Kazmierz Kosinski's body in the driver's seat of his vehicle, which was parked on Leclaire Avenue near Blackhawk Park in Chicago. Both of the vehicle's front seats were reclined, and Brasic recovered a condom wrapper on the floor of the vehicle. Brasic recovered three .25-caliber cartridge cases inside the vehicle. One cartridge case was recovered on the floor of the front passenger seat, another was on the floor of the rear passenger seat, and a third was found on the driver's seat after Kosinski's body was removed. No weapons were recovered in the vehicle or on Kosinski's person. Kosinski appeared to have a gunshot wound on his left chest and right wrist, but his face did not appear to be injured. Brasic recovered several palm prints on the outside of Kosinski's vehicle.

¶ 10	Dr. Mitra Kalelkar testified that she performed the autopsy on Kosinski's body. Prior to the autopsy, Kalelkar observed a used condom inside Kosinski's clothing and a bullet on the cart on which Kosinski's body was lying. Kosinski did not have any bruises or injuries to his face, but he had three apparent gunshot wounds to his body. Kosinski was shot once in the left chest wall, and the bullet traveled to the right and down to his spinal cord, where the bullet was recovered. Due to the path of the bullet, Kalelkar opined that the gun was positioned to the left and slightly above the victim. Kosinski also sustained a gunshot wound to his right wrist, and the bullet entered his inside palm and exited through the wrist. Kalelkar observed evidence that both gunshots were contact wounds, meaning that the barrel of the gun was touching Kosinski's skin when it was fired. Kosinski had a third gunshot graze wound on his right hip, but there was no evidence that the shot was fired from close range. A toxicology test revealed that Kosinski's blood alcohol level was twice the legal limit at the time of his death. Kalelkar opined that Kosinski died as a result of multiple gunshot wounds and that the manner of his death was a homicide.

¶ 11	Police officer Richard Chenow, a ballistics expert, testified that he examined the three cartridge cases recovered from the vehicle, but he could not determine whether they were fired from the same gun. Also, he examined two bullets recovered from the crime scene, but they were mutilated and unsuitable for comparison.

¶ 12	The parties stipulated that Victoria Psichalinos would testify that she is an expert fingerprint examiner, and that she examined the palm prints recovered from the outside of Kosinski's vehicle. Psichalinos compared those prints to individual palm prints taken from defendant, Siler, McComb, Paschal, and Kosinski, and she opined that they did not match the prints recovered from the vehicle.

¶ 13	The parties also stipulated that a pedestrian recovered Kosinski's wallet and placed it in a mailbox on August 28, 1994. Psichalinos examined three fingerprints recovered from inside the wallet and opined that they did not match the individual fingerprint samples provided by defendant, Siler, McComb, Paschal, or Kosinski.

¶ 14	                    B. Interview of Ramona Siler

¶ 15	Detective William Johnston testified that he investigated Kosinski's murder, and that he initially thought it was related to prostitution since the victim was found near Blackhawk Park, a place known for prostitution, and a used condom was recovered inside Kosinski's clothing. On September 5, 1994, Johnston learned that a prostitute named Ramona "Tracy" Siler, who usually worked nearby at the intersection of Dickens and Cicero Avenues, had not been observed for several days following the murder. Police officers later observed Siler at 8:30 p.m. that evening and arrested her on a bond forfeiture warrant.

¶ 16	Following her arrest, Siler was placed in an interview room at the 25th District police station and Detective Johnston and his partner, Detective Stephen Gawrys, questioned her concerning Kosinski's murder. Siler initially told Johnston that she did not know anything about Kosinski's death, and that she needed to be released from custody so that she could attend to her children, who were alone in a hotel room. Johnston did not release Siler and

instead sent two police officers to check on the children. The officers later telephoned Johnston from the hotel and told him that Siler's pimp, defendant, was alone in the hotel room, and that defendant stated that Siler's children did not live there. Johnston instructed the officers to ask defendant to accompany them to the police station for an interview, and defendant arrived at the Area 5 police station later that evening. Johnston identified defendant in court.

¶ 17 Johnston resumed the interview with Siler, and she received her *Miranda* warnings. This time, Siler admitted that she did have information concerning the murder near Blackhawk Park. On the night of the shooting, Siler was working "her corner," which was the intersection of Dickens and Cicero Avenues, with another prostitute, named Birandi "Brittany" Paschal. Defendant, Siler's pimp, and Alanda "JR" McComb, Paschal's pimp, were also present that evening.

¶ 18 Siler told Johnston that, at 2 a.m., a prior customer pulled up to Siler and motioned for her to approach his vehicle. The customer told Siler that he wanted to hire two prostitutes that evening, and he pointed to Paschal. Siler and Paschal both entered the customer's vehicle, and he drove to a location near Blackhawk Park. Defendant and McComb followed behind them in their own vehicle and parked ahead of the customer.

¶ 19 After the customer parked his vehicle, Siler and Paschal performed sex acts on him. Siler eventually stopped and told the customer that his "time was up," but he reached into the vehicle's visor and handed Siler $10, and she resumed. Shortly thereafter, Paschal reached into the customer's pants for his wallet, and an argument ensued. The customer became physical with Paschal and called her a "black bitch," so Siler shouted for defendant and McComb to come help. Defendant and McComb ran to the customer's vehicle, and McComb punched him. Defendant then pulled out a small, semiautomatic handgun and shot the customer twice. Siler observed the muzzle of the gun flash, and she heard both shots.

¶ 20 After the shooting, Siler and Paschal returned to McComb and defendant's vehicle, and they drove away[1] with the victim's wallet. McComb handed the customer's wallet to Paschal, who then removed $160 in cash and divided it equally amongst the group before throwing the wallet out the vehicle's window. While they were in the vehicle, Siler observed the victim's blood on defendant's shoes. At some point, they stopped and McComb hid the gun underneath the hood of the vehicle, and they continued to drive away.

¶ 21 Siler told Johnston that, at the time of the shooting, she had been using $40 of heroin per day and that defendant used $200 of heroin daily. Up until this point in the interview, Johnston had not shown Siler any photographs of the crime scene or potential suspects.

¶ 22 Siler remained in police custody overnight following her interview. The next day, Assistant State's Attorney Myles Hahn arrived at the Area 5 police station and spoke with Siler. Afterwards, Siler provided a written statement in the presence of Johnston and Hahn. Siler remained in police custody a second night, and Johnston arranged to have her testify before the grand jury the next day.

---

[1]Johnston did not testify whether Siler identified who drove the vehicle or where they drove.

¶ 23                           C. Ramona Siler's Prior Statement

¶ 24       The parties stipulated that Assistant State's Attorney (ASA) Myles Hahn would testify that he interviewed Siler on September 6, 1994, and that he summarized what she told him in a written statement. Siler's prior statement was offered into evidence and published to the jury at trial. In the statement, Siler stated that she received her *Miranda* warnings and that she understood them. She then described the shooting that took place on August 28, 1994, and her account was substantially similar to what she told Detective Johnston. Siler stated that she worked as a prostitute at the time, and that defendant was her protector and pimp, as well as her boyfriend of two years. At 2 a.m., she was standing at the corner of Dickens and Cicero Avenues with another prostitute, named Brittany, when a man drove up and propositioned them for sex. Siler did not know the man's name at the time, but she identified him as the victim, Kazmierz Kosinski, in a Polaroid photograph, which she signed. Siler and Brittany accepted Kosinski's offer and they entered his vehicle. Kosinski then drove to Leclaire Street near Palmer Street, and defendant and "JR," a man that Brittany stayed with, followed.

¶ 25       Siler stated that she and Brittany performed sexual acts for Kosinski for five minutes, at the conclusion of which Kosinski negotiated Siler for extra time in exchange for more money. At the same time, Brittany reached into Kosinski's pocket, and he responded, "Stop that, black bitch," and hit Brittany on the side of her head. Siler then yelled to defendant and JR for help, both of whom were sitting in their vehicle parked three parking spaces away. JR, the driver, exited his vehicle and ran toward Kosinski and punched him as he sat in his vehicle. Defendant then approached Kosinski, pulled out a gun, and shot him twice. Defendant, JR, Siler, and Brittany returned to JR's vehicle, and JR drove away. As they drove away, defendant told Brittany to split up the money that she recovered from Kosinski's wallet amongst the four of them. Defendant then asked Siler if he had any blood on him, but Siler's statement does not include her response.

¶ 26       Siler's statement concluded with an acknowledgement that she was treated well by ASA Hahn and the police, and that she was not threatened in any way. Siler also stated that she was not offered any promises in exchange for giving her statement and that she was not under the influence of any drugs or alcohol at the time. No corrections were made to the statement, and Siler, Hahn, and Johnston signed each page.


¶ 27                           D. Ramona Siler's Grand Jury Testimony

¶ 28       ASA Ray Regner testified that he spoke with Siler concerning Kosinski's murder, and she agreed to testify before the grand jury on September 7, 2004. Regner testified that Siler was coherent when he spoke with her and that he did not offer her any promises in exchange for her testimony. Specifically, Regner did not promise Siler that she could go home after she testified.

¶ 29       Siler's grand jury testimony was also offered into evidence and published to the jury at trial. Siler testified that defendant had been her boyfriend for four years and that they had lived together for the past two years. Siler made a living as a prostitute, and defendant was her "protector," meaning that if she ever fought with a man she was "dating," then defendant

would "jump in" and help her. On the evening of September 6, 1994,[2] Siler was at the intersection of Dickens and Cicero Avenues with a woman that Siler knew only as "Brittany." Defendant was there that evening to protect Siler, and JR was there to protect Brittany. At 2 a.m., Siler observed a blue vehicle that she had observed three times before, so she flagged it down. She recognized the driver as Kazmierz Kosinski, the victim. Kosinski pulled over and Siler offered him sex in exchange for money. Kosinski told her that he wanted the services of two women that evening, and Brittany agreed to the offer. Siler and Brittany entered Kosinski's vehicle and he drove them to a location near Blackhawk Park. Siler observed that defendant had followed them and was parked in front of Kosinski's vehicle.

¶ 30        Siler testified that she and Brittany began to perform sex on Kosinski, and that Siler stopped after six minutes and told him that he needed to pay her more money if he wanted her to continue. Kosinski agreed and paid Siler, and he placed his wallet on the side of his seat. Brittany then reached for his wallet, but Kosinski caught her. He grabbed Brittany's hair, hit her head, and called her a "black bitch." At that point, Siler, Brittany, and Kosinski started fighting, but defendant was too strong for the two women, so Siler exited the vehicle and called for defendant to help by yelling his name and urging him to "come on." JR ran to the vehicle, pulled Kosinski halfway out of the vehicle, and punched him. JR then told Siler and Brittany to exit Kosinski's vehicle. Siler testified that she assumed JR was searching for Kosinski's money since she thought she heard JR say, "Give me the money," though she was not sure.

¶ 31        Siler testified that she and Brittany then ran to JR's vehicle and passed defendant on their way. Defendant had a gun in his hand and Siler urged him to "come on" and "get in the car." Siler had observed the gun before and knew that defendant was armed that evening; however, Siler did not observe a weapon in Kosinski's possession. Defendant continued running to Kosinski's vehicle, faced him, and shot him once. Siler and Brittany then entered JR's vehicle and Siler backed it up to pick up defendant and JR. As she was backing up, she heard a second gunshot. Siler exited the vehicle to find out what happened, and she observed defendant and JR running back toward their vehicle. Siler reentered the vehicle and sat in the backseat with defendant, and JR drove away. JR stopped the vehicle nearby on Palmer Street and hid the gun under the hood, and then continued to drive away. Defendant asked Siler if she observed any blood on him, and she responded that he had a little bit on his shirt. JR handed Kosinski's wallet to Brittany and, on his instructions, she removed the money and threw the wallet out the window. Brittany handed the money to JR, and he handed $40 to defendant, who later used the money to buy drugs. JR drove to North Avenue and Siler finished working that evening at that location.

¶ 32        Siler testified that she provided this information in a prior written statement to ASA Hahn and Detective Johnston on September 6, 1994. Siler identified the statement and

_____

[2]ASA Regner testified that he mistakenly asked Siler about the events of September 6, 1994, instead of August 28, 1994, the actual date of the murder. However, Regner testified that when he spoke with Siler prior to her grand jury testimony, they discussed the events that occurred on the night of the murder, not September 6, 1994. Also, Siler was taken into custody at the Area 5 police station on September 5, 1994, and released on September 7, 1994, after she testified before the grand jury.

- 7 -

acknowledged that she signed each page. The statement contained a true and accurate account of what happened the night of the murder, and no threats or promises were made to Siler in exchange for her statement. Siler was read her *Miranda* rights and she was treated well by the ASA and the police. Siler also testified that she was not made any threats or promises in exchange for her grand jury testimony and that her testimony was true and accurate.

¶ 33                                    E. Ramona Siler's Testimony at Trial

¶ 34        At trial, Ramona Siler testified that she is a 25-year-old high school dropout with seven children. In August 1994, Siler worked as a prostitute and defendant was her pimp. Defendant was also her boyfriend of nearly four years at that time, and they had lived together in a hotel for two years. That month, Siler was pregnant with her sixth child, of whom defendant was the father. Siler told defendant that he was the father of the child, the first and only child that they had together. Siler testified that she and defendant used heroin every day, and that she would typically spend over $50 to support her habit. Siler identified defendant in court.

¶ 35        Siler testified that she has been arrested for prostitution at least 30 times, and that she has used 8 false names. Siler typically performed sexual acts for customers in their vehicles, while defendant would "protect" her, meaning that he would follow Siler and park nearby and help her if she ever fought with a customer. In August 1994, Siler worked at the intersection of Dickens and Cicero Avenues with another prostitute, Birandi "Brittany" Paschal, whom she identified in court. Paschal's boyfriend, Alanda "JR" McComb, was also Paschal's pimp, and would also protect Brittany when she was working.

¶ 36        Siler first testified that she was working as a prostitute at the intersection of Dickens and Cicero Avenues during the early morning hours of August 28, 1994, but then stated that she did not remember the exact dates when she was working. Siler then denied knowing who Kazmierz Kosinski was and testified that she was not with Kosinski, defendant, Paschal, and McComb on the night of Kosinski's death.

¶ 37        Siler admitted that she provided a prior written statement to ASA Hahn and Detective Johnston and that she testified before the grand jury. The State asked Siler about a number of specific statements she made in her prior written statement and grand jury testimony, and Siler admitted to providing the statements. Siler acknowledged that she was treated well by both ASAs and the police and that she was never made any promises or threats in exchange for her written statement and grand jury testimony.

¶ 38        On cross-examination, Siler testified that, at the time of the shooting, she had five children from three different fathers, and that her heroin addiction was so strong that her first priority was to become high before taking care of her children. Siler admitted that she used heroin even though she knew that it could harm her unborn child. Siler was six months pregnant with defendant's child in August 1994, and defendant repeatedly told her that he was not the father. Defendant has two other prostitutes, Gina and Rhonda. Like Siler, Rhonda has a child with defendant as well as a tattoo of defendant's nickname on her hand.

¶ 39        Siler also testified that she lied to the police because she was a heroin addict and she did not want to suffer from withdrawal in jail. When Siler was arrested, she lied to the police that she

- 8 -

had five children alone in her hotel room because she thought that they would release her from custody. Detective Johnston then interviewed Siler concerning Kosinski's death, and Siler was not released from custody even though she told him that she did not know anything about the murder. Siler then made up a story based on the photographs that Johnston showed her, and she implicated defendant and McComb, the only two pimps she knew, in the shooting. Siler was still in custody when she testified before the grand jury, and she was going through heroin withdrawal at the time. She admitted that she lied under oath because she thought she would be able to go home and avoid a murder charge if she testified. Siler was in fact released without charges after she testified before the grand jury.

¶ 40                          F. Defendant's Testimony at Trial

¶ 41        Defendant testified in his own defense and denied shooting Kosinski. Defendant admitted that he was Siler's pimp and that she frequently worked at the intersection of Dickens and Cicero Avenues. Defendant would sometimes follow Siler to protect her from other pimps, but he denied being present the night Kosinski was murdered. Defendant explained that he was previously in a relationship with Siler, but that he told her in August 1994 that he could not support her once she became pregnant since her stomach was showing and she did not make enough money. Defendant denied that he was the father of Siler's child and noted that the child's skin color and hair texture were different from his own. However, Siler still told him that he was the father.

¶ 42        On cross-examination, defendant admitted that he was previously Siler's pimp and boyfriend, and that McComb was Paschal's pimp. However, defendant denied working with McComb, and he testified that he did not carry a gun. Defendant further denied that he was Siler's pimp and boyfriend in August 1994, and he stated that she no longer lived with him at that time. Defendant admitted that he was addicted to heroin in August 1994. Defendant testified that he had lied to the police and provided false names on several occasions. On September 5, 1994, two police officers arrived at defendant's hotel room looking for Siler's children, and defendant voluntarily returned to the Area 5 police station with them. At the police station, defendant spoke with Detectives Johnston and Gawrys concerning the shooting, but defendant denied telling them that he had spent every night with Siler except the night of the shooting.

¶ 43        In rebuttal, the State called Detective Stephen Gawrys, who testified that when he asked defendant where he was on the night of the shooting, defendant stated that he was with Siler every other night except that one.

¶ 44                          G. Closing, Conviction, and Sentence

¶ 45        At closing argument, the defense argued that Siler was not credible and that defendant was not present when Kosinski was shot and killed. The jury convicted defendant of murder and armed robbery. Codefendant Birandi Paschal was also found guilty of murder and armed robbery by a separate jury, but codefendant Alanda McComb was acquitted following a bench trial. After considering factors in aggravation and mitigation, the trial court sentenced

- 9 -

defendant to 60 years in the Illinois Department of Corrections for murder, to be served concurrently with a 20-year sentence for armed robbery.

¶ 46                                II. Posttrial Proceedings

¶ 47    On direct appeal, defendant claimed that his convictions should be reversed because: (1) the evidence was insufficient to convict him; (2) certain evidence was improperly admitted; (3) the trial court erred in instructing the jury; and (4) his counsel provided ineffective assistance by not objecting to the inadmissible evidence. On March 1, 1999, we reversed defendant's armed robbery conviction, but rejected defendant's other claims. *People v. Morrow*, 303 Ill. App. 3d 671 (1999). Defendant was denied leave to appeal on June 2, 1999. *People v. Morrow*, 184 Ill. 2d 567 (1999) (table).

¶ 48    While defendant's petition for leave to appeal to the Illinois Supreme Court was still pending, defendant's counsel filed his first postconviction petition on April 23, 1999. In his petition, defendant claimed: (1) that his trial counsel provided ineffective assistance by failing to interview Siler before trial, investigate alibi witnesses, and object to improper evidence and arguments; (2) that he was forced to be tried by a jury and to testify in his own defense; and (3) that his sentence was excessive and improperly entered without a presentence investigation. The trial court later granted the State's motion to dismiss the petition, and we affirmed the dismissal on appeal. *People v. Morrow*, No. 1-00-3878 (2002) (unpublished order under Supreme Court Rule 23).

¶ 49    On February 11, 2010, defendant filed a *pro se habeas corpus* petition, which was later dismissed by the trial court, and we affirmed the dismissal on appeal. *Morrow v. Ryker*, No. 1-10-1243 (2010) (unpublished order under Supreme Court Rule 23). In February 2011, defendant filed a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure. 735 ILCS 5/2-1401 (West 2006). The trial court later dismissed the section 2-1401 petition, and defendant appealed; however, the appellate record in this case does not reveal the outcome of defendant's prior appeal.

¶ 50    While defendant's appeal of the dismissal of his *pro se habeas* petition was still pending, defendant filed a motion for leave to file a successive *pro se* postconviction petition on December 5, 2011. In his successive petition, defendant argued that his appellate counsel was ineffective for not arguing on direct appeal that defendant's trial counsel was ineffective for failing to request second-degree murder instructions. Defendant explained that he filed his original postconviction petition on April 23, 1999, while his petition for leave to appeal to the Illinois Supreme Court was still pending, in order to comply with the statute of limitations under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(c) (West 2006)), which required petitions to be filed within the sooner of three years from conviction or six months after direct appeal. As a result, defendant argued that he had cause to file a successive postconviction petition since he had to file his first petition to comply with the Act and he did not discover his appellate counsel's ineffectiveness until his petition for leave to appeal was denied later on June 2, 1999. The trial court denied defendant leave to file a successive petition, finding that, although defendant established cause to file his successive petition, he did not show prejudice since the evidence did not support a finding of second-degree murder.

¶ 51    Defendant now appeals the denial of his leave to file a successive *pro se* postconviction petition.

¶ 52                                           ANALYSIS

¶ 53    On appeal, defendant argues that the trial court improperly denied him leave to file a successive *pro se* postconviction petition since he established both cause and prejudice. Specifically, defendant argues that he demonstrated prejudice in his claim that his trial counsel was ineffective for failing to request a second-degree murder instruction, and that his appellate counsel ineffectively failed to raise this claim on direct appeal. In response, the State argues that defendant did not establish prejudice since the evidence did not support a finding of second-degree murder. However, we find that counsel's decision not to request a second-degree murder instruction was appropriate as a matter of trial strategy, and we affirm defendant's conviction and sentence as a result.

¶ 54    The Post-Conviction Hearing Act provides that "[o]nly one petition may be filed by a petitioner under this Article without leave of the court." 725 ILCS 5/122-1(f) (West 2006). A petitioner may be granted leave to file another postconviction petition "only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure." 725 ILCS 5/122-1(f) (West 2006). "To establish 'cause,' the defendant must show some objective factor external to the defense impeded his ability to raise the claim in the initial postconviction proceeding." *People v. Coleman*, 2013 IL 113307, ¶ 82 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 460 (2002)). "To establish 'prejudice,' the defendant must show the claimed constitutional error so infected his trial that the resulting conviction violated due process." *Coleman*, 2013 IL 113307, ¶ 82 (citing *Pitsonbarger*, 205 Ill. 2d at 464). Our review of the trial court's dismissal of defendant's postconviction petition is *de novo*. *People v. Edwards*, 197 Ill. 2d 239, 247 (2001). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 55    As an initial matter, we address defendant's argument that our review is subject to a more lenient consideration of cause and prejudice as set forth in *People v. LaPointe*, 365 Ill. App. 3d 914, 924 (2006). In that case, the Second District held that a section 122-1(f) motion "need state only the gist of a meritorious claim of cause and prejudice." *LaPointe*, 365 Ill. App. 3d at 924. Although defendant points to Justice Burke's dissent in *People v. Evans*, 2013 IL 113471, ¶¶ 23-24, in support of his argument that there is a "split of authority in the appellate court" concerning the applicable standard for a successive *pro se* postconviction petition, defendant has not cited another decision that has accepted *LaPointe*'s "gist" standard. Moreover, Justice Burke noted in *Evans* that *LaPointe* has been rejected in *People v. Edwards*, 2012 IL App (1st) 091651, ¶¶ 21-22. Also, our supreme court recently rejected the argument that successive petitions should be considered under the same first-stage "gist" standard as an initial postconviction petition. *People v. Edwards*, 2012 IL 111711, ¶ 25. As such, we decline to follow the more lenient standard set forth in *LaPointe*.

¶ 56    Next, we consider defendant's claim that he established prejudice sufficient to file a successive petition because his trial counsel was ineffective for not requesting a second-degree

murder instruction at trial, and that his appellate counsel was ineffective for failing to raise this claim on direct appeal. " 'The sixth and fourteenth amendment of the United States Constitution guarantee the fundamental right of a defendant in a criminal case to be effectively assisted by counsel.' " *People v. Young*, 347 Ill. App. 3d 909, 927 (2004) (quoting *People v. Spann*, 332 Ill. App. 3d 425, 429 (2002), citing U.S. Const., amends. VI, XIV). A claim of ineffective assistance of counsel is judged according to the two-prong, performance-prejudice test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504, 525 (1984); *People v. Boyd*, 363 Ill. App. 3d 1027, 1034 (2006). "To obtain relief under *Strickland*, a defendant must prove [1] that defense counsel's performance fell below an objective standard of reasonableness and [2] that this substandard performance caused prejudice by creating a reasonable probability that, but for counsel's errors, the trial result would have been different." *Boyd*, 363 Ill. App. 3d at 1034 (citing *Strickland*, 466 U.S. at 687-88). A defendant must satisfy both prongs of the *Strickland* test to prevail on a claim of ineffective assistance of counsel. *People v. Flores*, 153 Ill. 2d 264, 283 (1992).

¶ 57    A person commits the offense of second-degree murder when he or she commits the offense of first-degree murder, and he or she unreasonably believes at the time of the killing that the circumstances are such that, if they existed, they would justify or exonerate the killing. 720 ILCS 5/9-2(a)(2) (West 2010). The statute "takes into account that human beings, in a heated atmosphere, might reach conclusions which seem to them under the circumstances reasonable, but which in the cold light of rational analysis are obviously unreasonable. It is the genius of our law that, while not condoning unreasonable behavior, it nevertheless recognizes and takes into account that human beings may reach unreasonable beliefs, given the circumstances of the moment and the conditions under which beliefs are formulated and drawn." *People v. Vaughn*, 26 Ill. App. 3d 247, 255 (1975). Where there is even slight evidence in the record that, if believed by the jury, would reduce the crime to a lesser-included offense, an instruction defining the lesser offense should be given. *People v. Upton*, 230 Ill. App. 3d 365, 374 (1992) (citing *People v. Perry*, 19 Ill. App. 3d 254, 257-58 (1974), *People v. Stevenson*, 196 Ill. App. 3d 225, 230 (1990), and *People v. Willis*, 170 Ill. App. 3d 638, 641 (1988)).

¶ 58    Defendant argues that his counsel was ineffective since the evidence at trial was sufficient for a finding of second-degree murder. Siler testified at trial that, at the time of the shooting, defendant was her pimp and "protector"; defendant was her boyfriend of four years and she lived with him for two years; she was five months pregnant with defendant's child; and she "loved" defendant and his nickname was tattooed on her wrist. On August 28, 1994, Kosinski fought with Siler and she called to defendant for help, and in response defendant ran to her defense and shot Kosinski to protect the life of his girlfriend and unborn child. Defendant argues that, since defendant unreasonably believed that he was justified in killing Kosinski, the evidence supports a conviction of second-degree murder, and his trial counsel was ineffective in failing to request an instruction.

¶ 59    However, even if we determine that there was sufficient evidence to support a second-degree murder instruction, defense counsel may have concluded that a self-defense theory would have been incompatible with the theory presented, since it would require

- 12 -

defendant to admit to the shootings. " '[T]he decision of whether to submit an instruction on a lesser included offense is typically considered to be one of trial strategy that has no bearing on the competency of counsel because counsel could have reasonably believed that the instruction would have converted a likely acquittal into a likely conviction of the lesser crime.' " *People v. White*, 2011 IL App (1st) 092852, ¶ 70 (quoting *People v. Cathey*, 406 Ill. App. 3d 503, 512 (2010), *rev'd on other grounds*, 2012 IL 111746). Here, defense counsel made the strategic decision to argue that the State failed to prove its case, and although defendant's trial counsel's argument was ultimately unsuccessful, that "does not mean counsel performed unreasonably and rendered ineffective assistance." *People v. Walton*, 378 Ill. App. 3d 580, 589 (2007).

¶ 60   This case would be different if the defense counsel had conceded in his or her opening that defendant had committed the murder. " '[W]here defense counsel argues a theory of defense but then fails to offer an instruction on that theory of defense, the failure cannot be called trial strategy and is evidence of ineffective assistance of counsel.' " *White*, 2011 IL App (1st) 092852, ¶ 65 (quoting *People v. Serrano*, 286 Ill. App. 3d 485, 492 (1997)). When defense counsel concedes that defendant is the murderer, then the only issues left for the jury to resolve at trial are issues relating to affirmative defenses and second-degree murder. If counsel then fails to follow through and fails to request the appropriate instructions, then this may be considered ineffectiveness of counsel. *People v. Lewis*, 240 Ill. App. 3d 463, 469-70 (1992) (finding that where trial counsel told the jury in closing, " 'You got an easy job on Nimrod. If it was justified, you turn him loose, if it wasn't, you convict him,' " trial counsel was ineffective for failing to submit an instruction on justification or voluntary manslaughter).

¶ 61   However, that is not the case here. In the case at bar, the defense counsel contested the fact that defendant was the murderer, from the opening remarks through cross-examination, and right through to the closing. Defendant testified in his own defense that he did not shoot Kosinski and that he was not even present during the commission of the offense. At that point, the decision whether to request a second-degree instruction, and thus give the jury a compromise point short of a full acquittal, became a part of the trial strategy.

¶ 62   Although defendant argues now that he unreasonably believed he was justified in killing Kosinski to protect his girlfriend and unborn child, at trial defendant testified that, in August 1994, he no longer lived with Siler and she was no longer his girlfriend, and he denied that he was the father of Siler's child. Since defendant himself denied that he was in a relationship with Siler at the time of the shooting, defendant's testimony does not support his theory for second-degree murder and instead supports the conclusion that the decision not to request a second-degree murder instruction was a matter of trial strategy.

¶ 63   We observe that the sentencing range for first-degree murder is 20 to 60 years (730 ILCS 5/5-4.5-20(a) (West 2012)), while the sentencing range for second-degree murder is 4 to 20 (730 ILCS 5/5-4.5-30(a) (West 2012)). Although one's exposure under first-degree murder is greater, it is possible to receive the same sentence whether one is convicted of first-or second-degree murder. The ultimate sentence is left to the trial court's discretion, which counsel may address at sentencing by showing mitigating factors. *People v. Haley*, 2011 IL App (1st) 093585, ¶ 63. This overlap in possible sentences is part of the reason why the

decision whether to ask for a second-degree murder instruction is usually considered part of the defense's trial strategy.

¶ 64　　We conclude that defendant's trial counsel did not render ineffective assistance because the "record here establishes that defense counsel thoroughly investigated and prepared defendant's case and reasonably chose to argue defendant's complete innocence in the shooting, rather than a justification for it." *People v. Jones*, 234 Ill. App. 3d 1082, 1098 (1992). In turn, defendant's appellate counsel was not ineffective in failing to raise the issue on direct appeal since there was no merit to defendant's claim. As a result, the trial court did not err in denying defendant leave to file a successive postconviction petition since defendant did not establish prejudice, and we affirm defendant's conviction and sentence. Since we find that defendant did not show prejudice, we need not consider whether he had cause to file his successive petition.

¶ 65　　　　　　　　　　　　　　　　CONCLUSION

¶ 66　　For the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 67　　Affirmed.